Argued and submitted March 29, in CA A50593, denial of motion to suppress evidence obtained under warrant to search for Kenneth Mark Evans affirmed; denial of motion to suppress evidence obtained under telephonic warrant reversed as to Kenneth Mark Evans only; remanded for new trial for Kenneth Mark Evans only; in CA A50594 and CA A50595, judgments affirmed December 4, 1991

STATE OF OREGON,
*Respondent,*

*v.*

KENNETH MARK EVANS,
*Appellant,*

*and*

LAURI EVANS,
*Defendant.*

(87-CR-0621-JC; CA A50593 (Control))

STATE OF OREGON,
*Respondent,*

*v.*

KENNETH MARK EVANS
and LAURA ANN EVANS,
*Appellants.*

(88-CR-0189-WE; CA A50594)

STATE OF OREGON,
*Respondent,*

*v.*

KENNETH MARK EVANS,
*Appellant.*

(88-CR-0190-WE; CA A50595)
(Cases Consolidated)

822 P2d 1198

Lawrence J. Hall, Deputy Public Defender, Salem, argued the cause for appellants. With him on the brief was Sally Avera, Public Defender, Salem.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Janet A. Klapstein, Assistant Attorney General, Salem.

Before Warren, Presiding Judge, and Joseph, Chief Judge, and Riggs, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

These consolidated criminal cases involve co-defendants, husband (Kenneth) and wife (Laura), who were tried together in 2 trials. Laura appeals only from her conviction for frequenting a place where controlled substances are used, ORS 167.222, in the second trial. Kenneth was convicted of conspiracy to manufacture a controlled substance, ORS 161.450; ORS 475.992, in the first trial and possession of a controlled substance, ORS 475.992, in the second. In a third, separate trial, Kenneth was convicted of being an ex-convict in possession of a firearm. ORS 166.270. We address the arguments by referring to the trials by their appeal numbers in this court.

### CA A50593[1]

At 4:45 p.m. on November 20, 1987, Oregon State Police officers and Deschutes County Sheriff's deputies executed a warrant authorizing a search for Kenneth at his rural Deer Lane residence, including a detached single-story wood-framed garage located north of the main dwelling. When the officers arrived, a housesitter told them that defendants were in Portland. They proceeded to search the premises. In the garage they found substantial quantities of methamphetamine and a container of methamphetamine oil. While some officers remained in the home, others searched outside and found a windowless storage shed, locked on the outside with a hasp and padlock. Officer Dodd detected the odor of methamphetamine or a precursor substance coming from the shed. Some of the officers unscrewed the hasp and opened the door but found no one inside. For the next 1 or 2 hours, they tried to write an affidavit for a warrant to search the shed.

At 6:10 p.m., Kenneth telephoned his home from a motel in Portland. Officer Tabor answered the phone. Kenneth identified himself as "Mark," the owner of the residence. Tabor responded that he did not believe that the caller owned the residence and hung up. Kenneth called several times in the next few minutes. Tabor listened to an answering machine as Kenneth left messages for the housesitter. At 6:25

---

[1] Although the parties argue the case as if Laura (who was indicted as Lauri Evans) is an appellant, the record does not contain a notice of appeal by her, and the disposition in CA A50593 relates only to Kenneth.

p.m. he called again. That time Tabor answered the phone and represented himself as a guest whom the housesitter had met at a bar. He told Kenneth that the housesitter had injected himself with methamphetamine and driven away. Tabor testified, "I told [Kenneth] that [the housesitter] had taken my car and that left me stranded * * *." Kenneth then told Tabor that he would return home immediately. Kenneth was arrested in Portland soon thereafter and was found to be in possession of a small amount of cocaine, some syringes and weapons. At 7:45 p.m., Dodd made an oral affidavit to obtain a telephonic warrant to search the shed, where the officers found evidence of methamphetamine production.

The trial court found that the affidavit in support of the first warrant established probable cause to believe that Kenneth would be at his residence. It based its ruling on these facts:

(1) Defendants had lived together at another address and a fellow officer had told the affiant that defendants had recently moved to a home on Deer Lane;

(2) Kenneth's date of birth was the same as that given the landlord by "Mark Johnson" when he leased the Deer Lane residence;

(3) Laura's car was parked at the residence, and police officers had seen Kenneth driving it;

(4) The affiant knew that Kenneth owned at least 5 pit bull dogs, and 6 dogs of that breed were at the residence;

(5) The description of the renter "Mark Johnson" that a citizen informant gave the affiant was similar to the description that the police had of Kenneth.

Kenneth argues that the trial court should have granted the motion to controvert and to strike the description of "Mark Johnson" from the affidavit, because the citizen informant named in the affidavit had never seen the renter but had relied on information from her husband. He also argues that the trial court erred in denying the motion to suppress evidence obtained during the search for Kenneth because, with or without the description, the affidavit did not

establish probable cause to believe that he could be found at the Deer Lane residence.[2]

Kenneth argues that the affidavit was insufficient, because the affiant relied on the presence of the dogs and Laura's car to establish that he was home when the warrant issued. He emphasizes that he was not on the property at the time of the search. If the affidavit did not establish probable cause to believe that he would be at the Deer Lane residence, then the warrant was invalid and any evidence obtained during the search must be suppressed. ORS 133.683. The state argues that probable cause does not require certainty but only a reasonable belief based on articulated facts that the things or persons sought will probably be at a particular location. It also argues that the affidavit, even without the description of "Mark Johnson," provides sufficient information for a magistrate to conclude that there was probable cause to believe that Kenneth would be found at the Deer Lane residence.

■■ We must construe the affidavit "in a commonsense, nontechnical and realistic fashion looking at the facts recited and the reasonable inferences that can be drawn from those." *State v. Prince*, 93 Or App 106, 112, 760 P2d 1356, *rev den* 307 Or 246 (1988). To support a warrant, the affidavit must recite facts sufficient to lead a neutral and detached magistrate to conclude that the things sought will probably be found in the location to be searched. *State v. Anspach*, 298 Or 375, 380-81, 692 P2d 602 (1984). We resolve doubtful or marginal cases in the light of a preference for warrants. *State v. Gale/Rowden*, 105 Or App 489, 496, 805 P2d 158, *rev den* 311 Or 427 (1991).

■ ■ Kenneth views probable cause too narrowly. An affidavit need not establish that the places to be searched are the only — or even the most likely — places in which items or

---

[2] ORS 133.555(2) provides:

"If the judge finds that the application meets the requirements of ORS 133.535 and that, on the basis of the record made before the judge, there is probable cause to believe that the search will discover things specified in the application and subject to seizure under ORS 133.535, the judge shall issue a search warrant based on the finding of the judge and in accordance with the requirements of ORS 133.545 to 133.615. If the judge does not so find, the judge shall deny the application."

persons might be found. *State v. Villagran*, 294 Or 404, 414, 657 P2d 1223 (1983). In this case, the affiant knew that defendants resided somewhere on Deer Lane. Considering the rural nature of the area, known as "Alfalfa," the presence of Laura's car was sufficient to show that Kenneth probably lived there. That 6 pit bull dogs were there and that the renter's birth date was the same as Kenneth's demonstrated a strong possibility that the renter who lived there was Kenneth. A person's residence is the most likely place to find the person or evidence of his whereabouts. The facts in the affidavit, even without the citizen's description of "Mark Johnson," established probable cause to search for defendant at the Deer Lane residence. If there was an error in denying the motion to controvert, it was harmless. *See State v. Morrison/Bartee*, 107 Or App 343, 350, 812 P2d 832 (1991); *State v. Prince, supra.*

The police were properly on the premises to search for Kenneth. We now turn to issues involving the warrant obtained to search the smelly shed.

Kenneth argues that the telephonic warrant was invalid, because the authorizing magistrate neither certified the transcript of the oral affidavit nor signed and filed an original warrant. The state admitted at the suppression hearing that it had no *certified* transcript of the oral affidavit and no warrant except the "duplicate original" that Dodd wrote while he was at the residence. It characterizes those defects as "merely procedural" and argues that the magistrate's failure to complete his ministerial tasks does not render the warrant void.

When issuance of a telephonic warrant is sought,

"the judge may take an oral statement under oath when circumstances exist making it impracticable for a * * * police officer to obtain a warrant in person. The oral statement shall be recorded and transcribed. The transcribed statement shall be considered to be an affidavit for the purposes of this section. In such cases, the recording of the sworn oral statement and the transcribed statement *shall be certified by the judge receiving it and shall be retained as a part of the record of proceedings* for the issuance of the warrant." ORS 133.545(5). (Emphasis supplied.)

The judge

> "may orally authorize a police officer * * * to sign the judge's name on a duplicate original warrant. A duplicate original warrant shall be a search warrant for the purposes of ORS 133.535 to 133.615, and it shall be returned to the judge as provided in ORS 133.615. In such cases a judge shall enter on the face of the original warrant the exact time of the issuance of the warrant and *shall sign and file the original warrant* in the manner provided by law." ORS 133.555(3). (Emphasis supplied.)

The trial court concluded that ORS 133.545(5) requires the magistrate to certify the transcript of the oral affidavit to preserve the record so that an examining court can "ascertain with accuracy what information the issuing magistrate had when he issued the search warrant and does not involve a constitutional question." The first part of that statement is true. *State v. Mathis*, 24 Or App 53, 56, 544 P2d 170, *rev den* (1976). The second part is mistaken.

■        Requiring an officer to articulate facts under oath to a magistrate, who then decides whether those facts demonstrate probable cause to justify a search, is the essence of Article I, section 9, of the Oregon Constitution:

> "[N]o warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The statute requires the issuing judge to make a record of the officer's articulation of the facts so that a reviewing court can determine whether the warrant was properly issued; that is, whether the defendant was subjected to a constitutionally permissible procedure. It is intended

> "to avoid the possibility of justification for a search or an arrest based upon facts or evidence discovered in the course of the execution of the warrant." *State v. Russell*, 293 Or 469, 473, 650 P2d 79 (1982).

■        The drafters also intended ORS 133.545 to reflect Fourth Amendment requirements "as expressed in existing and foreseeable decisions of the United States Supreme Court." *State v. Russell, supra*, 293 Or at 473. Both purposes are expressed in ORS 133.555(1), which concludes: "The record shall be admissible as evidence on any motion to

suppress." Every person is entitled to the protection of statutory requirements established to guarantee that evidence was gathered by a constitutionally permissible process.

■    Nevertheless, a statutory violation does not necessarily require suppression. *State v. Whalen*, 90 Or App 18, 21, 750 P2d 1168 (1988); *see State v. Valentine/Darroch*, 264 Or 54, 68, 504 P2d 84 (1972), *cert den* 412 US 948 (1973). When the procedure for issuing a telephonic warrant has not been perfectly followed, later performance can cure the defect. *State v. Nunn*, 99 Or App 503, 783 P2d 26 (1989); *State v. Jordan*, 73 Or App 84, 697 P2d 1004, *rev den* 299 Or 251 (1985); *State v. Feehely*, 27 Or App 343, 556 P2d 142 (1976), *rev den* 277 Or 1 (1977).

In this case, the magistrate *never* certified the transcribed oral affidavit. That defect would not be fatal had the affiant or the magistrate testified at the suppression hearing, as in *State v. Nunn, supra*, and *State v. Feehely, supra*. However, the trial court improperly decided the issue as a matter of law. It had before it no evidence to support a finding that the transcription accurately represented an underlying oral affidavit under oath.

■    Following ORS 133.545(5) serves to preserve the record on probable cause; ORS 133.555(3) serves a different function. It requires the issuing magistrate to enter the exact time on an original warrant when authorizing an officer to sign the magistrate's name on a duplicate original. A reviewing court can then compare the original with the officer's duplicate warrant to verify, for example, that the officers did not add items not approved by the magistrate.[3] *See State v. Jordan, supra*, 73 Or App at 89. If the magistrate mistakenly fails to sign or file the original warrant immediately, he may satisfy the requirement later by signing it *nunc pro tunc*. 73 Or App at 89. The state might also call the issuing magistrate as a witness at the suppression hearing to attest to the

---

[3] The handwritten warrant in this case commands officers to search "the residence and any outbuildings at [defendants' address] *including motor vehicles located at above address*." (Emphasis supplied.) The transcript of the telephone conversation between the officer and the magistrate quotes the magistrate as authorizing the search of the "dwelling and unattached shed" only; the officer recited no probable cause facts concerning any vehicles, and he neither asked for nor received authority to search any vehicles.

accuracy of the duplicate original. *See State v. Russell, supra,* 293 Or at 473. In this case, however, no attempt to cure was ever made. Moreover, no original warrant — signed or unsigned — was offered in evidence. The state presented nothing to show that a magistrate *ever* signed or filed an original warrant, and it presented nothing except the handwritten warrant drafted by Dodd to indicate what the original warrant contained. Indeed, the state offered no evidence that an original warrant ever existed.[4]

The trial court erred in denying the motion to suppress evidence obtained pursuant to the telephonic warrant as to Kenneth. We need not address the other arguments about that warrant.[5]

## CA A50594

On March 21, 1988, Deschutes County Sheriff's deputies executed a warrant to search the residence, outbuildings and persons at defendants' Apache Road address in Bend.[6] Kenneth and Laura both assign error to the trial court's denial of their motion to suppress, asserting that the affidavit contained inadequately corroborated information from a criminally involved informant and that the information was "stale."

Ipock was in police custody when he made the statements that were used in the affidavit. The state concedes that he was a "criminally involved informant." The affidavit

---

[4] ORS 133.555(3) is based on California Penal Code § 1528 (1970). *Proposed Oregon Criminal Procedure Code, Final Draft,* § 134, Commentary (1972). In construing that section, the California Court of Appeal observed:

"An 'oral' procedure * * * is permitted by statute only as to the *affidavit* in support of a search warrant: the Legislature has made no equivalent provision permitting 'oral' issuance of the warrant itself." *Bowyer v. Superior Court,* 37 Cal App 3d 151, 111 Cal Rptr 628, 635, 112 Cal Rptr 266 (1974).

[5] Kenneth argues, *inter alia,* that the oral affidavit included information illegally obtained during his telephone conversation with Tabor. He seems to argue that his statements to Tabor were also used as evidence against him independently of their use in the affidavit and that the statements should be suppressed, because Tabor violated his right to remain silent. He has not identified anything in the record to show that the statements were used as evidence or to show that the issue was preserved for appeal.

[6] The underlying affidavit also contained information that police used to obtain warrants to search another residence and a storage facility. The trial court granted motions to suppress evidence obtained by those searches.

recites, *inter alia*, that Ipock gave his statement voluntarily and that he had known Kenneth for approximately 15 years, since they were in high school together in Prineville; had been involved in manufacturing and distributing methamphetamine with Kenneth for the past 2 years; in the previous 2 months had helped Kenneth dismantle, transport and set up equipment to manufacture methamphetamine; and knows that Kenneth owned the equipment. He also described in considerable detail the equipment and the locations to which they had moved it.[7] The portion of the affidavit concerning defendants' residence reads:

> "IPOCK told me that he personally knows that [Kenneth] is presently living in Deschutes Riverwoods on Apache Rd. with his wife * * *. That this residence is blue in color with an unattached garage. IPOCK told me that he had recently stayed at [defendants'] residence and knows it to be as described. That at this residence, [Kenneth] had a 'drying setup' (used to dry methamphetamine) in the garage on March 11th, 1988[,] when IPOCK states he was last there. IPOCK said he also seen [sic] [Kenneth] with a large sum of money, in his residence, of which [sic] [Kenneth] described was $10,000.00 cash for his Attorney. IPOCK told me that he knows that [defendants] have no visible legal means of support, and that neither [Kenneth] nor his wife have [sic] a job. That [Kenneth] makes his money from manufacturing and distribution of methamphetamine."

The trial court found that the affidavit also showed that officers had independently corroborated defendants' address. The house was as Ipock described it, and officers saw vehicles registered to defendants parked there. The affiant also stated that he had training and experience about methamphetamine manufacturing processes and practices, including identification of manufacturing equipment, chemicals and packaging, and that he had participated in a search of defendants' Deer Lane residence that resulted in seizure of controlled substances and manufacturing equipment. The trial court found Ipock's descriptions sufficiently detailed for a magistrate to conclude that the information was based on

---

[7] Ipock reported moving "round-bottom flasks, heating mantles, condensers, and plastic tubing * * * [and said] they left 'P.A.' (phenyl acetic acid) and 'lead acetate' * * * [,] chemicals used in the manufacturing process of methamphetamine."

firsthand observations. It also found that the affiant's corroboration of some information adequately supported the magistrate's conclusion that Ipock's information was reliable.

■      Defendants argue that the standard by which to measure the sufficiency of the affidavit is controlled by *State v. Carlile*, 290 Or 161, 619 P2d 1280 (1980), and that *Carlile* applied the same test for the reliability of information from a named criminally involved informant as from unnamed informants under ORS 133.545(4).[8] The state responds that the statute applies only to unnamed informants and that the sufficiency of an affidavit containing information from any *named* informant is determined according to the "totality of the circumstances" test established in *Illinois v. Gates*, 462 US 213, 103 S Ct 2317, 76 L Ed 2d 527, *reh den* 463 US 1237 (1983).[9]

Defendants conclude from their reading of *State v. Carlile, supra*, that the standard articulated in ORS 133.545(4) *must* be applied when examining the reliability of a criminally involved informant. That case does not hold that. Although the court agreed that criminal involvement places a named informant's honesty and integrity under suspicion, it noted that such concerns are especially acute when an informant "hide[s] behind the cloak of anonymity." 290 Or at 167. The court used the *Aguilar/Spinelli* principles to examine the

---

[8] ORS 133.545(4) provides:

"The application [for a search warrant] shall consist of a proposed warrant in conformance with ORS 133.565, and shall be supported by one or more affidavits particularly setting forth the facts and circumstances tending to show that the objects of the search are in the places, or in the possession of the individuals, to be searched. If an affidavit is based in whole or in part on hearsay, the affiant shall set forth facts bearing on any unnamed informant's reliability and shall disclose, as far as possible, the means by which the information was obtained."

[9] In that case, the Supreme Court explained that the "tests" prescribed in *Aguilar/Spinelli* were intended to provide a method by which to examine an affidavit rather than to prescribe a standard that an affidavit must meet.

"[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of [the affiant's] report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case * * *. Rather, * * * they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." 462 US at 230.

affidavit, but it did *not* hold that the information *had* to satisfy *Aguilar/Spinelli*.

In *State v. Farrar*, 309 Or 132, 786 P2d 161 (1990), *aff'd* 946 F2d 898 (9th Cir 1991), the court amplified its position. The relevant portion of the affidavit contained information from a named informant, who made statements implicating herself as an accessory after the fact to the defendant's crimes. Even though she could be classified as "criminally involved," the court explained:

> "The express terms of ORS 133.545, which codified the *Aguilar/Spinelli* test, specifically limit its application to *unnamed* informants. ORS 133.545 does not apply to *named* informants." 309 Or at 144.

The court nevertheless found that *Aguilar/Spinelli* provides a useful framework within which to consider the issue.

In contrast, we recently examined an affidavit that reported information from a "confidential reliable informant" (CRI), who had received his information from a named person. *State v. Young*, 108 Or App 196, 816 P2d 612 (1991). We applied the "totality of the circumstances" test to determine whether the affidavit as a whole contained information sufficient to support a search warrant. 108 Or App at 202. Because the primary informant was unnamed, we applied ORS 133.545 to all of the CRI's statements, including the information that he got from the named person. 108 Or App at 203. We did not, however, expressly hold that the *Aguilar/ Spinelli* test applies to named informants.

In this case, Ipock disclosed a sufficient basis of knowledge to demonstrate that he knew defendants' identities. His admitted involvement with Kenneth in operating a methamphetamine lab indicates the reliability of his general information about Kenneth's practices in manufacturing the substance. *See State v. Carlile, supra,* 290 Or at 167. His admitted involvement and the details that he provided about methamphetamine production demonstrated his knowledge and his ability to identify a methamphetamine manufacturing operation. Ipock said that he had visited defendants a number of times and that there "was a 'drying setup' (used to dry methamphetamine) in the garage on March 11, 1988."

From those facts, the magistrate could reasonably infer that Ipock was reporting first hand observations of methamphetamine production in defendants' garage. The affidavit expressly states that Ipock's information about cash, paperwork and directions for manufacturing methamphetamine was all based on his personal observations. Given the corroboration by police that defendants lived where Ipock said that they did and the affiant's first hand knowledge of defendants' earlier possession of methamphetamine and methamphetamine manufacturing supplies, based on the lawful searches at Deer Lane and incident to Kenneth's previous arrest, the magistrate could reasonably conclude that Ipock's information was reliable.

Defendants also argue that Ipock's information was "stale," because he had observed the contraband 10 days before the warrant issued. The state argues, and the trial court found, that the affidavit contained sufficient evidence of a continuing illegal activity for the magistrate to reasonably conclude that the items sought were probably still at defendants' residence when he issued the warrant. *See State v. Ingram*, 251 Or 324, 327-28, 445 P2d 503 (1968).

Even assuming that "stale" is a word having any legal significance, *but see State v. Young, supra*, 108 Or App at 204, the time between an informant's observations and the request for a warrant is only one factor among all the circumstances for a magistrate to consider. *State v. Gale/Rowden, supra*, 105 Or App at 497. The character of the crime or the thing to be seized also affects whether an item is likely to remain in one place for some time. *State v. Young, supra*, 108 Or App at 204. When the crime is manufacture of a controlled substance, particularly by a suspect who has a history of manufacturing drugs, a magistrate can reasonably infer that the conduct will continue for some time after it was last observed. In *State v. Black/Black*, 36 Or App 613, 585 P2d 44, *rev den* 284 Or 521 (1978), the informant knew that the defendant had had drugs in his home on many occasions during a 7- or 8-month period. His last visit to the defendants' home was 3 to 4 weeks before the warrant issued. We concluded that, given the continuous nature of the defendants' activities, the magistrate could reasonably infer that drugs would probably be there when he issued the warrant.

Defendants assert that 10 days is too long in this case, because the affidavit indicates that they moved their manufacturing equipment approximately twice every 2 months. Even if we were to accept defendants' premise that drug manufacturers can also manufacture staleness by habitually moving equipment, which we do not, their reasoning fails on these facts. Ipock said that he and Kenneth moved equipment on March 11, the same day that he saw the drying setup and other contraband in the home. Using defendants' own "twice in 2 months" formula, a magistrate could reasonably infer that equipment had not been moved in the past 10 days. Moreover, the whole matter of moving the equipment is irrelevant to probable cause.

The magistrate could reasonably rely on the corroborated information about defendants' habits and continuing course of illegal activity to find that at least some of the equipment and contraband would still be at their home. *State v. Gale/Rowden, supra.* The affidavit included:

"I know through training and experience that the manufacture of methamphetamine normally requires at least two days worth of work. It has been my experience that once a lab is assembled it is usually used to produce several batches of methamphetamine and is normally in production for a week or more at a time. In fact, it has been my experience that most labs stay in production at a particular site for a minimum of two weeks, especially when set up at the manufacturer's residence."

Viewed as a whole, the affidavit established probable cause to believe that evidence of methamphetamine production would be found at defendants' residence when the warrant issued.

Finally, defendants argue that evidence seized from the search of "all persons present including but not limited to [defendants]" should be suppressed, because the affidavit: (1) did not request authorization to search any persons and (2) provided insufficient facts for a magistrate to find probable cause that any evidence of criminal activity would be found on defendants. The state argues that the searches beyond the scope of the warrant were valid as incident to defendants' arrest.

Police lawfully searched defendants' residence and found evidence of the crime of manufacturing a controlled

substance. They arrested defendants for that crime. Evidence related to that crime, such as records, could reasonably have been expected to be concealed on defendants' persons. *State v. Owens*, 302 Or 196, 729 P2d 524 (1986); *State v. Spencer*, 92 Or App 459, 758 P2d 885 (1988). Therefore, the searches of defendants were lawful incident to arrest.

Because we dispose of the issue on that ground, we need not address defendants' argument about the sufficiency of the affidavit to show probable cause to search defendants.

## CA A50595

In a separate trial, Kenneth was convicted of being an ex-convict in possession of firearms. ORS 166.270. He assigns error to the trial court's denial of his motion to suppress evidence that was seized under the same warrant discussed in CA A50594. He asserts the same arguments already discussed and, in addition, that the "seizure of the firearms was outside the scope of the search warrant[, because it] only authorized seizure of 'concealable firearms.'" The dispositions of the same arguments in CA A50594 apply also in this case.

The state does not argue that the rifles and shotgun found at the Apache Road residence were lawfully seized. However, those weapons were not used in evidence against defendant in this case. The only firearms evidence offered at trial was one operational revolver less than 16 inches long. Kenneth offers no reason why the revolver is not a "concealable weapon." Even if police exceeded the scope of the search warrant by seizing nonconcealable firearms, those guns were not put in evidence. There is nothing to suppress.

In CA A50593, denial of the motion to suppress evidence obtained under the warrant to search for Kenneth Mark Evans is affirmed; denial of the motion to suppress evidence obtained under the telephonic warrant is reversed as to Kenneth Mark Evans only; remanded for a new trial for Kenneth Mark Evans only; in CA A50594 and CA A50595, judgments affirmed.