Argued and submitted April 22, 1996, reversed and remanded in part; otherwise affirmed; cross-appeal by Parks dismissed October 22, 1997, both petitions for review denied April 7, 1998 (327 Or 82)

STATE OF OREGON,
*Appellant,*

*v.*

BRIAN CHARLESWORTH,
*Respondent.*

(93-08-35550; CA A83960 (Control))

STATE OF OREGON,
*Appellant - Cross-Respondent,*

*v.*

ROBERT L. PARKS,
*Respondent - Cross-Appellant.*

(93-08-35551; CA A83961)
(Cases Consolidated)

951 P2d 153

Timothy A. Sylwester, Assistant Attorney General, argued the cause for appellant in CA A83960 and appellant - cross-respondent in CA A83961. With him on the briefs were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, Janet A. Klapstein, Assistant Attorney General, and David E. Leith, Assistant Attorney General.

Marc Sussman argued the cause and filed the brief for respondent Brian Charlesworth.

W. Mark McKnight filed the cross-appeal for respondent - cross-appellant Robert L. Parks.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

■ Defendants Charlesworth and Parks were indicted for racketeering, conspiracy to commit racketeering, delivery of controlled substances, and conspiracy to deliver controlled substances.[1] The state appeals various pretrial orders in favor of defendants. Charlesworth cross-assigns error to orders in favor of the state.

The indictment against defendants arose out of an investigation that began in 1989 into drug-trafficking activities by Charlesworth. As a result of that investigation, a federal grand jury indicted Charlesworth in December 1992 for money laundering in violation of 18 USC § 1956. The federal indictment charged Charlesworth with seven counts of money laundering by using in certain transactions funds that he knew were the proceeds of unlawful drug trafficking. Charlesworth pleaded guilty to those counts pursuant to a plea agreement. A federal court sentenced him to 92 months' imprisonment on the counts.

On April 21, 1993, police searched Parks' home in Riverside County, California, pursuant to a search warrant. They also searched his car after obtaining his consent to do that. In the search of the car, the police found and searched a briefcase that contained two address books and other documents. Those documents were used to obtain additional search warrants.

On August 30, 1993, a Multnomah County grand jury returned a 14-count indictment against defendants. Counts 1 through 10 in the indictment alleged charges against Charlesworth and Parks. The indictment charged Charlesworth with four counts of racketeering in violation of the Oregon Racketeer Influenced and Corrupt Organizations Act (ORICO), ORS 166.720(2), 166.720(3); four counts of conspiracy to commit racketeering, ORS 161.450, 166.720(3), 166.720(4); one count of delivery of a controlled substance, ORS 475.992; and one count of conspiracy to deliver a controlled substance, ORS 161.450, 475.992. The indictment

---

[1] Although the indictment lists four defendants, only Charlesworth and Parks are involved in this appeal. Parks filed a notice of cross-appeal but did not file a brief. Accordingly, we dismiss his cross-appeal for want of prosecution. ORAP 1.20.

charged Parks with one count of racketeering, ORS 166.720(3), and one count of conspiracy to commit racketeering, ORS 161.450, 166.720(4).

Defendants filed a number of pretrial challenges to the indictment and the evidence. They demurred to the racketeering and conspiracy to commit racketeering counts on the ground that those counts failed to state crimes.[2] The trial court sustained the demurrer on that ground and dismissed the indictment. The court dismissed the indictment against Charlesworth on the further ground that the Oregon constitutional guarantee against double jeopardy barred the state from prosecuting him for offenses arising from the conduct that had led to his federal money-laundering convictions. In addition, Charlesworth moved to suppress evidence obtained from a file that his lawyer had kept in the course of representing him. The trial court denied that motion. Finally, Parks moved to suppress evidence obtained from the search of his briefcase. The trial court granted that motion.

The state first assigns error to the court's order sustaining defendants' demurrer to counts 1 through 8 of the indictment. We review a trial court's ruling on a demurrer challenging the validity of an indictment for legal error. ORS 138.220.

Count 1 of the indictment charged defendants with racketeering under ORS 166.720(3).[3] To allege a crime under that statute, the state had to allege, *inter alia*, that defendants had engaged in a pattern of racketeering activity. To establish the required pattern, count 1 alleged that defendants had engaged in conduct constituting 23 criminal offenses, 14 of which involved money laundering by Charlesworth.

---

[2] Although Charlesworth and a codefendant filed the demurrer, the trial court applied it to all defendants.

[3] ORS 166.720(3) provides, in pertinent part:

"It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity * * *."

ORS 166.715(6)(b) incorporates into the definition of racketeering activity "any conduct defined as 'racketeering activity' under 18 USC § 1961(1)(B), (C) and (D)." The current definition of racketeering activity in 18 USC § 1961(1)(B) includes as covered activity money laundering in violation of 18 USC § 1956. It is that provision on which the state based its allegation that Charlesworth's money-laundering activities constituted racketeering activity in violation of ORS 166.715(6)(b).

Defendants demurred to the 14 paragraphs in count 1 of the indictment that contain the money-laundering allegations. When ORS 166.715 was enacted in 1981,[4] money laundering was not included in the definition of racketeering activity in 18 USC § 1961. That is because money laundering in violation of 18 USC § 1956 was not added to the definition of racketeering activity until 1986.[5] Defendants argued that ORS 166.715(6)(b) incorporates only the version of 18 USC § 1961(1)(B) that existed at its enactment. Because money laundering was not included in 18 USC § 1961(1)(B) at that time, the references to money laundering in the indictment did not state a crime.

The state argued in response that the reference in ORS 166.715(6)(b) to 18 USC § 1961 should be interpreted as a reference to the current version of the statute. The trial court disagreed. It held that ORS 166.715(6)(b) incorporates only the 1981 version of 18 USC § 1961(1)(B). Accordingly, the court struck the 14 paragraphs in the indictment that referred to money laundering and sustained the demurrer to count 1. Additionally, the court struck counts 2 through 8 of the indictment because those counts referred to the stricken allegations from count 1, which made the former counts indefinite and uncertain after count 1 was stricken. ORS 135.630(6).

On appeal, the state contends that the trial court erred in its construction of ORS 166.715(6)(b) and therefore erred in striking the money-laundering allegations from the indictment. Alternatively, the state argues that, even if the

---

[4] *See* Or Laws 1981, ch 769, § 2.

[5] *See* Pub L No. 99-570, § 1365(b), 100 Stat. 3207 (Oct. 27, 1986).

court did not err in construing the statute, it erred in dismissing the balance of the indictment.

We first consider whether the reference to 18 USC § 1961(1)(B) in ORS 166.715(6)(b) makes money laundering in violation of 18 USC § 1956 a racketeering activity under Oregon law. The state treats the issue as one that turns on whether the legislature intended the reference to 18 USC § 1961(1)(B) to refer to a specific statute or to a general body of law. The Supreme Court explained the distinction and its apparent significance in *Seale v. McKennon*, 215 Or 562, 572, 336 P2d 340 (1959):

> "When a statute adopts by specific reference the provisions of another statute, * * * such provisions are incorporated in the form in which they exist at the time of the reference, and not as subsequently modified; whereas, where the reference is general, such as a reference to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws not only in their contemporary form but also as they may be changed from time to time."

(Citations omitted.)

The problem with the state's formulation of the issue is that it fails to deal with the prohibition in the Oregon Constitution against the delegation of legislative power to others. If, as the state contends, ORS 166.715(6)(b) *is* intended to incorporate changes to 18 USC § 1961 as Congress makes those changes, then the statute violates that prohibition.[6] Hence, if the state's interpretation is correct, the statute is unconstitutional.

We conclude that the state's interpretation is not correct. Nothing in the statute or its legislative history resolves

_____

[6] *See, e.g., Seale*, 215 Or at 571-72; *Hillman v. North Wasco Co. PUD*, 213 Or 264, 277-86, 323 P2d 664 (1958); *Brinkley v. Motor Vehicles Division*, 47 Or App 25, 27, 613 P2d 1071 (1980). The prohibition is based on the provisions in the Oregon Constitution that separate the state's governmental power into legislative, executive and judicial powers, Or Const Art III, § 1, that allocate the legislative power to the legislature and, through the initiative and referendum, to the people, *id.* Art IV, § 1, and that prohibit the enactment of laws, "the taking effect of which shall be made to depend upon any authority, except as provided in [the c]onstitution," *id.* Art I, § 21.

whether the legislature intended ORS 166.715(6)(b) to incorporate post-enactment changes to 18 USC § 1961. We are to construe statutes to be constitutional, if that can be done. That readily can be done here if ORS 174.060 does not prevent us from construing ORS 166.715(6)(b) to incorporate only the version of 18 USC § 1861 that existed at its enactment.

■ ORS 174.060 provides:

"When one statute refers to another, *either by general or by specific reference or designation*, the reference shall extend to and include, in addition to the statute to which reference was made, amendments thereto and statutes enacted expressly in lieu thereof unless a contrary intent is expressed specifically or unless the amendment to, or statute enacted in lieu of, the statute referred to is substantially different in the nature of its essential provisions from what the statute to which reference was made when the statute making the reference was enacted."

(Emphasis supplied.) If ORS 174.060 applies, it requires us to construe ORS 166.715(6)(b) to violate the Oregon Constitution. We conclude, however, that ORS 174.060 does not apply to the interpretation of statutes that refer to non-Oregon law. If ORS 174.060 were to apply to statutory references to non-Oregon law, it would mean that ORS 174.060 is itself unconstitutional because it, too, would run afoul of the Oregon constitutional prohibition against the delegation of legislative power. Neither the text of ORS 174.060, in context, nor its legislative history requires such a construction, however, so we construe ORS 174.060 to apply only to references to Oregon statutes. Based on that construction, we construe ORS 166.715(6)(b) not to incorporate amendments to 18 USC § 1961 made after the enactment of ORS 166.715(6)(b).

■ The state makes an alternative argument that amendments to ORS 166.715 since its enactment in 1981 should be construed to have incorporated intervening changes to 18 USC § 1961 without any alteration to the reference to 18 USC § 1961 in the text. We reject that argument. Nothing in the text of ORS 166.715, in context, or in the legislative history of its amendments supports the state's position. If the legislature had intended to incorporate later

changes to 18 USC § 1961 in ORS 166.715, it presumably would have added language to the statute that identified the relevant version of 18 USC § 1961 by date. In the absence of such language, we cannot conclude that amendments to provisions of ORS 166.715 other than the subsection that refers to 18 USC § 1961 had the effect of amending that subsection.

■ In summary, we conclude that ORS 166.175(6)(b) includes as racketeering activity only that conduct that 18 USC § 1961(1)(B), (C) and (D) defined as racketeering activity when ORS 166.715(6)(b) was enacted. That does not include money laundering in violation of 18 USC § 1956, so the trial court properly struck the money-laundering allegations from the indictment.

Accordingly, we turn to whether, in the absence of the money-laundering allegations, the court erred in dismissing the balance of the indictment. The state argues that, even if the 14 paragraphs alleging money laundering were properly stricken, the remaining allegations in count 1 stated a prosecutable racketeering offense. In addition, the state argues that counts 2 through 8 are sufficient to state an offense. We agree.

■ The trial court sustained defendants' demurrer to count 1 on the ground that count 1 failed to state an offense. ORS 135.630(4).[7] Under ORS 135.630(4), an "indictment fails to state facts constituting an offense when it fails to allege each of the essential elements of the offense." *State v. Wimber*, 315 Or 103, 109, 843 P2d 424 (1992).

■■ Here, count 1 alleged the essential elements of a racketeering offense even without the money-laundering allegations. Count 1 charged defendants with violations of ORS 166.720(3). Under that statute, the state must allege "a pattern of racketeering activity," which is defined in ORS 166.715(4) as

---

[7] ORS 135.630 provides, in pertinent part:

"The defendant may demur to the accusatory instrument when it appears upon the face thereof:

"* * * * *

"(4) That the facts stated do not constitute an offense[.]"

"[e]ngaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise[.]"

(Emphasis supplied.) In addition to money laundering, count 1 charged defendants with nine additional racketeering offenses, including delivery of a controlled substance, conspiracy to deliver a controlled substance, hindering prosecution, obstruction of governmental administration, and bribe giving. Generally, allegations that track the statutory definition of the charged crime are sufficient to apprise a defendant of the offense against him. *State v. Romig*, 73 Or App 780, 789, 700 P2d 293, *rev den* 299 Or 663 (1985). Because each of the additional nine racketeering offenses tracks the statutory definition of the crimes charged, we conclude that the trial court erred in dismissing count 1.[8]

We next turn to whether the trial court erred in dismissing counts 2 through 8 of the indictment. Those counts are based on the allegations in count 1. Because the court dismissed count 1 in its entirety, it also dismissed counts 2 through 8, because of their reliance on the allegations in count 1. We have concluded, however, that the court erred in dismissing count 1, so the reasoning on which the court dismissed counts 2 through 8 no longer applies. Accordingly, we

---

[8] Our decision in *State v. Fair*, 145 Or App 96, 929 P2d 1012 (1996), *rev allowed* 325 Or 45 (1997), does not affect our conclusion. *Fair* involved an ORICO indictment against an alleged member of a street gang. The indictment used the language of ORS 166.715 to allege the necessary pattern of racketeering activity. We held that the statutory language was insufficient in that case to apprise the defendant of the particular circumstances that made his conduct criminal. We reasoned that the relationship among the racketeering acts involved in that case, in the context of an enterprise as amorphous as a street gang, was not sufficiently apparent to apprise the defendant of the basis of the charges. The facts of this case, involving an alleged conspiracy to distribute controlled substances and avoid prosecution for that conduct, do not present the same problem.

This case is also different from *State v. Kincaid*, 78 Or App 23, 714 P2d 624 (1986). There, we held that an ORICO indictment that alleged predicate offenses of theft, but did not specify any details about those thefts, was insufficient to apprise the defendant of the charge, even though the indictment tracked the statutory language for an ORICO offense. There is no question here about the adequacy of the indictment to apprise defendants of the details of the predicate offenses of which they were charged.

conclude that the trial court erred in dismissing counts 2 through 8 of the indictment.

■ The state next assigns error to the order dismissing the indictment against Charlesworth on double jeopardy grounds. Because the trial court's findings on the issue are not in dispute, we review its order for legal error. *State v. Delker*, 123 Or App 129, 132, 858 P2d 1345 (1993), *rev den* 318 Or 326 (1994).

■ Charlesworth moved to dismiss the state indictment on the ground that his prior federal conviction for money laundering barred the state from prosecuting him for conduct related to those offenses. He based the motion on state statutory and constitutional prohibitions against double jeopardy. The trial court rejected defendant's statutory argument but dismissed the indictment on double jeopardy grounds under the Oregon Constitution. Relying on *State v. Smith*, 101 Or 127, 199 P 194 (1921), the court held that Oregon does not recognize the "dual sovereignty" exception to the constitutional guarantee against double jeopardy and, therefore, that "a former prosecution by a foreign sovereign for the same criminal conduct is a bar to [a subsequent Oregon] prosecution."

The state argues that the trial court misread *Smith* and, consequently, erred in ruling that Oregon does not recognize the dual sovereignty exception. We agree.

■ Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be put in jeopardy twice for the same offence."[9] The prohibition against placing a person twice in jeopardy for an offense is subject to an exception, customarily referred to as the dual sovereignty exception, under which two sovereigns can prosecute a defendant for the same act. *See, e.g., State v. Emerson*, 86 Or App 506, 509, 739 P2d 1079 (1987).

The Oregon Supreme Court recognized and endorsed that exception in *Smith*:

---

[9] On appeal, neither party makes arguments under the double jeopardy provision of the federal constitution, so we analyze the issues presented by this assignment solely under the Oregon Constitution.

> " 'Every citizen of the United States is also a citizen of the state or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both. * * * That either, or both may (if they see fit) punish such an offense, cannot be doubted.' "

Or at 134-35 (citation omitted). The court held, however, that the exception did *not* apply to state and federal prosecutions for liquor law violations while the Eighteenth Amendment to the United States Constitution was in effect. There appear to be two bases for the court's conclusion.

One basis was that the Eighteenth Amendment gave the state and federal governments concurrent jurisdiction to enforce the amendment. The court reasoned, as a corollary, that state and federal laws enacted for that purpose were not the product of separate and independent sovereigns, because the laws were enacted pursuant to a unitary source of governmental authority. Consequently, enforcement of Prohibition laws by either government was equivalent to enforcement by both, so that a prosecution by one barred a second prosecution by either for the same act. The other basis was that the Eighteenth Amendment was not intended to establish a legal regime in which people could be prosecuted in both state and federal court for the same conduct under laws enacted to enforce it.

No matter which explanation applies, it is apparent that *Smith* has no bearing on this case. The state and federal RICO laws were not enacted pursuant to a unitary grant of legislative authority, but from the authority that the state and federal governments independently have to enact laws. Because there is no unitary grant of legislative authority to enact RICO laws, there is no basis to interpret that grant to limit the ability of the state and federal governments to prosecute people independently under those laws for the same conduct.

We know of no ground on which to reject application of the dual sovereignty exception to permit separate state and federal RICO prosecutions for the same conduct. Hence,

the court erred in dismissing the indictment against Charlesworth on the ground that the prosecution violated the Oregon constitutional guarantee against double jeopardy.[10]

The state also assigns error to the trial court's order suppressing evidence seized from Parks' car. Parks moved to suppress evidence from his briefcase and any fruits of that evidence on the ground that the search of the briefcase was beyond the scope of his consent to search his car. The state argued that Parks' unqualified consent to search his car extended to items found in it, including the briefcase. The court granted the motion on the ground that Parks had not consented voluntarily to the search of his car.

The state argues that Parks voluntarily consented to the search of his car.[11] The state further contends that, because Parks' consent was without any limitation, the search of the briefcase found in the car was within the scope of the consent.

■■■■ Unreasonable searches and seizures are prohibited under Article I, section 9, of the Oregon Constitution.[12] Ordinarily, for a search to be reasonable, the police must have a search warrant. *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). A warrantless search is not unreasonable, however, if it comes within one of the recognized exceptions to the warrant requirement. *Id.* One of the exceptions is consent. Under that exception, the state bears the burden of proving

---

[10] Because of our resolution of the issue, we need not decide whether the federal money-laundering offenses were the same offenses as the ORICO offenses for which Charlesworth was indicted. We reject without discussion Charlesworth's contention that the prohibitions in ORS 167.252 and ORS 475.265 against successive prosecutions barred the state ORICO prosecution.

[11] The state also argues that the trial court improperly considered whether Parks voluntarily consented to the search, because Parks challenged only the scope of his consent and not whether it was voluntary. The state did not make that argument below, so we do not consider it. *State v. Isom*, 313 Or 391, 405, 837 P2d 491 (1992).

[12] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

by a preponderance of the evidence that consent was voluntary. *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991).

In reviewing the voluntariness of a defendant's consent to search, we will not disturb the trial court's findings of historical fact if they are supported by the evidence. The determination whether consent was voluntary is a legal issue that we review independently. *State v. Bea*, 318 Or 220, 230, 864 P2d 854 (1993); *Stevens*, 311 Or at 135.

In its suppression order, the trial court made the following findings:

"[Police] saw defendant Parks back his white Nissan 300ZX out of the garage and back down the driveway. As he did so, police drove up to the house, blocked defendant's car and stopped it. They ordered Mr. Parks to get out. They informed him that they had a search warrant for his house and they asked him to unlock the house. At the time this request was made defendant was surrounded by a number of officers who had their weapons drawn. Access to the house was obtained through the garage which defendant opened with an electronic door opener.

"While he was surrounded by armed police, defendant was handcuffed. Officer Wilham of the Riverside Police Department asked defendant if it was okay to search his car and defendant said 'Yeah, go ahead.'

"Defendant then led the police into his house through the garage. Police removed defendant's handcuffs so that he could turn off the burglar alarm after he opened the house door and entered the house. After they entered the house, police told defendant to sit in the dining room. Police questioned him there.

"Gresham Police Officer Peterson was assigned the task of searching defendant's car. He asked Riverside Officer Wilham if defendant had given consent to a search of his car. Wilham said yes, so Peterson proceeded outside to search the car. Peterson did not himself ask defendant if he consented to the search.

"Officer Peterson entered the car. On the passenger seat he saw a 'satchel' or briefcase, made of burgundy or maroon leather, which had three zippered pockets. Officer Peterson removed the container from the car and took it into the house.

"When he re-entered the house, defendant was seated in a dining room chair. Officer Peterson stood about 15 feet away. He unzipped the briefcase and examined the contents. He found two address books, both of which contain defendant Haslett's name and phone numbers. He removed them and turned them over to Portland officers Kansler and Kruger. The documents were incorporated into subsequent search warrant affidavits.

"Defendant had been arrested previously and has considerable experience with the criminal justice system. He knows that he has the right to refuse to give consent to do things. Before the briefcase was opened, he had received Miranda advice and he had declined to talk with officers."

Based on those findings, the court concluded:

"At no time did defendant voluntarily and willingly consent to a search of his car or a search of the contents of the briefcase. He merely acquiesced to the authority of the police who had him surrounded and in custody. * * * As a legal matter, acquiescence to police authority is not free and voluntary consent."

██ ██ We disagree with the trial court's conclusion that Parks' consent was involuntary. The test for voluntariness is whether, in the light of the totality of the circumstances, defendant's consent was a product of his own free will or was the result of coercion, express or implied. *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983). The court found that Parks was handcuffed and surrounded by police officers with their weapons drawn when he consented to the search of his car. The court also found, however, that Parks had had considerable experience with the criminal justice system and that he knew that he had the right to refuse to consent to the search. Under the totality of the circumstances, we conclude that Parks' consent was voluntary.

We turn to whether Parks' consent to search his car included consent to search things found in it.

"When police rely on consent as the basis for their search, they have no more authority than they are given by the consent. A consent to search may be confined in scope to specific items, restricted to certain areas or limited in purpose or time. * * * One factor in determining the permissible scope of a search authorized by consent is the content of

the request for consent. When a request to search contains no limitations and a defendant places no limitation on the search, the scope of the allowable search may be fairly broad."

*State v. Allen*, 112 Or App 70, 74, 826 P2d 127, *rev den* 314 Or 176 (1992).

■ Here, the officer's request to search Parks' car contained no limitation on the proposed search. In agreeing to the request, Parks placed no restriction on it. On this record, we conclude that the consent to search the car included consent to search things found in the car. The court erred, therefore, in granting Parks' motion to suppress.

We turn now to Charlesworth's cross-assignments of error. We reject without discussion Charlesworth's first cross-assignment of error. We consider his second and third cross-assignments of error together because they present similar factual and legal issues.

The pertinent facts are not in dispute. On August 19, 1991, Schmitz, a legal secretary employed by Charlesworth's attorney, Haslett, photocopied a file kept by Haslett in the course of his representation of Charlesworth. She did so because she believed that it contained evidence of ongoing criminal activity by Haslett and Charlesworth.[13] She acted on her own initiative.

On November 4, 1991, Schmitz showed the file to her uncle, Blodgett, a retired detective with the Portland Police Bureau. Blodgett perfunctorily examined the documents and placed them in a sealed envelope. Blodgett then contacted the Multnomah County District Attorney and explained to him that he had some documents that might contain evidence of criminal activity. The District Attorney sent an investigator to get the documents with instructions not to read or examine them. The documents were then taken to the District Attorney's office, where they were sealed and placed in a safe. No one at the District Attorney's office examined the documents.

---

[13] Haslett was one of the original codefendants in this case. He was prosecuted under a superseding indictment and convicted of one count of racketeering.

Subsequently, agent Poppen interviewed Schmitz about what she had observed while she was employed by Haslett. Based on those interviews and other information, he prepared an affidavit in support of an application for a search warrant and for an *in camera* inspection of the documents. After a hearing, the trial court issued a warrant to permit the seizure of the documents. The documents were then turned over to the court for review. After conducting an *in camera* inspection, the court released 17 of the documents to investigators. The remaining documents were returned to Haslett.

Information from Schmitz and the 17 documents was incorporated into affidavits in support of a number of search warrants, including a warrant to search Haslett's law office. The state intends to offer at trial some of the evidence seized under the authority of those warrants.

Defendants moved to suppress the evidence seized from Charlesworth's legal file and all evidence derived from that seizure. The court denied defendants' motion, concluding that there was probable cause to support the issuance of the warrant and that the documents seized from Charlesworth's legal file came within the crime-fraud exception to the attorney-client privilege.

Charlesworth challenges the denial of the motion to suppress on the grounds that (1) the affidavit submitted by Poppen in support of the warrant to search the legal file was not supported by probable cause and (2) the affidavit improperly included privileged attorney-client communications and client secrets.

In reviewing the sufficiency of an affidavit in support of a search warrant, we construe the affidavit "in a common-sense, nontechnical and realistic fashion looking at the facts recited and the reasonable inferences that can be drawn from those [facts]." *State v. Evans*, 110 Or App 46, 51, 822 P2d 1198 (1991). To support a warrant, the affidavit must recite facts sufficient to lead a neutral and detached magistrate to conclude that the things sought will probably be found in the location to be searched. We resolve doubtful or marginal cases in the light of a preference for warrants. *State v. Gale / Rowden*, 105 Or App 489, 496, 805 P2d 158, *rev den* 311 Or 427 (1991).

■ Charlesworth argues that the affidavit submitted by Poppen lacks probable cause because it is based on mere suspicion and Schmitz' conclusory statements. We disagree. The information submitted by Schmitz provides a basis on which a neutral magistrate could conclude that Charlesworth's file contained information about Haslett's participation in, or facilitation of, ongoing criminal activity by Charlesworth.

■ Charlesworth further contends that the Poppen affidavit improperly relied on privileged attorney-client communications and client secrets to establish probable cause. Attorneys are required to preserve their clients' secrets. ORS 9.460; DR 4-101.[14] That obligation imposes on attorneys a duty to exercise reasonable care to prevent their employees from disclosing client secrets. DR 4-101(D).[15] Attorneys are

---

[14] ORS 9.460(3) provides:

"An attorney shall:

"* * * * *

"(3) Maintain the confidences and secrets of the attorney's clients consistent with the rules of conduct established pursuant to ORS 9.490[.]"

DR 4-101 provides, as relevant:

"(A) 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in a current or former professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

"(B) Except when permitted under DR 4-101(C), a lawyer shall not knowingly:

"(1) Reveal a confidence or secret of the lawyer's client.

"(2) Use a confidence or secret of the lawyer's client to the disadvantage of the client.

"(3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

"(C) A lawyer may reveal:

"(1) Confidences or secrets with the consent of the client or clients affected, but only after full disclosure to the client or clients.

"(2) Confidences or secrets when permitted by a Disciplinary Rule or required by law or court order or secrets which the lawyer reasonably believes need to be revealed to effectively represent the client.

"(3) The intention of the lawyer's client to commit a crime and the information necessary to prevent the crime. * * *"

[15] DR 4-101(D) provides:

"A lawyer shall exercise reasonable care to prevent the lawyer's employees, associates, and others whose services are utilized by the lawyer in

subject to discipline if they fail to fulfill those obligations. We are unaware, however, of any authority to suppress evidence obtained as a result of an attorney's violation of his or her obligation to preserve client secrets, as distinct from privileged communications. Even if Haslett had failed to take reasonable steps to prevent his secretary from disclosing Charlesworth's secrets, that failure does not provide a basis to suppress evidence obtained as a result of that disclosure.[16]

We turn to whether the search warrant lacked probable cause because it was based on an affidavit that contained privileged attorney-client communications. OEC 503 contains the attorney-client privilege:

"(2) A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"(a) Between the client * * * and the client's lawyer * * *;

"* * * * *

"(3) The privilege created by this section may be claimed by the client * * *."

Thus, the client is the holder of the attorney-client privilege, and the client may prevent any "other person" from disclosing confidential communications between the client and the client's lawyer made for the purposes of facilitating the rendition of professional legal services. However, the attorney-client privilege does not apply

"[i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the

---

connection with the performance of legal services from disclosing or using confidences or secrets of a client * * *."

[16] After the court denied the motion to suppress, the legislature amended ORS 9.490(2) to provide that

"[a] court of this state may not order that evidence be suppressed or excluded in any criminal trial, grand jury proceeding or other criminal proceeding, or order that any criminal prosecution be dismissed, solely as a sanction or remedy of a rule of profession conduct adopted by the Supreme Court."

Because neither party addresses whether ORS 9.490(2) as amended is applicable to this case, we do not decide that issue.

client knew or reasonably should have known to be a crime or fraud[.]"

OEC 503(4)(a).

 A party who seeks to rely on the crime-fraud exception to the attorney-client privilege to obtain or introduce evidence must establish that "the client, when consulting the attorney, knew or should have known that the intended conduct was unlawful." *State ex rel N. Pacific Lbr. v. Unis*, 282 Or 457, 464, 579 P2d 1291 (1978). Here, the state made the required showing through Poppen's affidavit. Based on the information in the affidavit, the court did not err in finding that Charlesworth consulted Haslett in order to further a continuing criminal scheme.

 Charlesworth contends, nevertheless, that in order to establish a basis to conduct an *in camera* review of privileged communications to determine whether the crime-fraud exception applies to those communications, the proponent of the evidence must make a threshold showing using only evidence that is "independent" of the contested communications themselves. Although Oregon courts have not addressed that issue, we are persuaded by the reasoning in *United States v. Zolin*, 491 US 554, 109 S Ct 2619, 105 L Ed 2d 469 (1989), to reject such a requirement.[17]

In *Zolin*, the court noted that *in camera* review " 'is a [lesser] intrusion upon the confidentiality of the attorney-client relationship than is public disclosure.' " *Id.* at 572 (citation omitted). Further,

"[t]here can be little doubt that * * * evidence directly but incompletely reflecting the content of the contested communications[ ] generally will be strong evidence of the subject matter of the communications themselves. Permitting district courts to consider this type of evidence would aid

---

[17] The Supreme Court framed the issue this way in *Zolin*:

"The specific question presented is whether the applicability of the crime-fraud exception must be established by 'independent evidence' (*i.e.*, without reference to the content of the contested communications themselves), or, alternatively, whether the applicability of that exception can be resolved by an *in camera* inspection of the allegedly privileged material."

491 US at 556 (footnote omitted).

them substantially in rapidly and reliably determining whether *in camera* review is appropriate."

*Id.* at 573. The court concluded that

"a rigid independent evidence requirement does not comport with 'reason and experience,' * * * and we decline to adopt it as part of the developing federal common law of evidentiary privileges. We hold that *in camera* review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception. We further hold, however, that before a district court may engage in *in camera* review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability. Finally, we hold that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged."

*Id.* at 574-75.

We agree with *Zolin* that the threshold showing to obtain *in camera* review does not have to be based on independent evidence. Accordingly, we conclude that the state made the required showing even though Poppen's affidavit contained evidence that was not entirely independent of the allegedly privileged attorney-client communications themselves.

■ Finally, Charlesworth argues that the disclosure of information from his legal file violated his constitutional right to counsel.[18] The right to counsel is protected by Article I, section 11, of the Oregon Constitution and the Sixth Amendment to United States Constitution.[19] That right

---

[18] In addition, Charlesworth argues that the procedure by which the court authorized an *in camera* inspection of his legal file violated his Fourteenth Amendment right to due process. Because Charlesworth did not raise that issue below, we will not consider it. *State v. Isom*, 313 Or 391, 405, 837 P2d 491 (1992).

[19] Article I, section 11, of the Oregon Constitution provides, in relevant part:

"In all criminal prosecutions, the accused shall have the right to * * * to be heard by himself and counsel * * *."

The Sixth Amendment to the United States Constitution provides, in relevant part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense."

depends on an effective attorney-client privilege. The privilege does not extend to communications that come within the crime-fraud exception. OEC 503(4). The recognition and enforcement of that exception does not violate a defendant's constitutional right to counsel. Consequently, the disclosure of information from Charlesworth's legal file that came within the exception did not violate Charlesworth's right to counsel.

In summary, we conclude that the trial court did not err in denying Charlesworth's motion to suppress evidence obtained from his legal file.

Orders dismissing the indictment against Charlesworth and Parks and suppressing the evidence obtained from the search of Parks' briefcase reversed and remanded; otherwise affirmed; cross-appeal by Parks dismissed.