Argued and submitted November 8, 2006; resubmitted en banc June 7, affirmed September 26, 2007, petition for review allowed February 14, 2008 (344 Or 109)

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

AMBER SERENITY CASTILLEJA,
*Defendant-Respondent.*

CR030092; A127255 (Control)

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

MICHAEL SANTOS CASTILLEJA,
*Defendant-Respondent.*

Yamhill County Circuit Court
CR030093; A127256

168 P3d 1177

Rolf C. Moan, Assistant Attorney General, argued the cause for appellant. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Peter Gartlan, Chief Defender, Legal Services Division, argued the cause for respondent Amber Serenity Castilleja. With him on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Leland R. Berger argued the cause and filed the brief for respondent Michael Santos Castilleja.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

ROSENBLUM, J.

Edmonds, J., dissenting.

Schuman, J., dissenting.

**ROSENBLUM, J.**

In these consolidated actions, the state appeals from a pretrial order granting defendants' motion to suppress evidence of marijuana discovered in their home when the police executed a search warrant there. Defendants moved to suppress the evidence, claiming that some of the information in the police affidavit in support of the warrant application had been obtained unlawfully during a warrantless search of their home. The state contended that, even without the offending information, the affidavit was sufficient to furnish probable cause to believe that, more likely than not, defendants, who held medical marijuana cards, possessed more than the maximum amount of usable marijuana allowed them under the Oregon Medical Marijuana Act (OMMA). The trial court excised the unlawfully obtained information and concluded that, without that information, the affidavit did not furnish probable cause to issue a warrant. It therefore granted defendants' motion to suppress. The state appeals. It does not challenge the trial court's decision to excise from the affidavit the information obtained during the initial, warrantless search. It argues only that, even without the excised information, the affidavit was sufficient to issue the search warrant. We review the trial court's determination that the affidavit did not furnish probable cause for errors of law, but we are bound by the trial court's factual findings that are supported by evidence in the record. We affirm.

Before we recite the facts of this case, a brief overview of the pertinent provisions of the OMMA is helpful. The 2001 version of the OMMA was in effect at the time of the search at issue in this case. ORS 475.306(1) (2001), *amended by* Oregon Laws 2005, chapter 822, section 2, provided that a person who possessed a "registry identification card"—commonly referred to as a "medical marijuana card"—could lawfully possess three mature marijuana plants, four immature plants, and one ounce of "usable marijuana" per mature plant. The OMMA defines "usable marijuana" as "the dried leaves and flowers of the plant Cannabis family Moraceae, and any mixture or preparation thereof, that are appropriate for medical use as allowed in ORS 475.300 to 475.346. 'Usable marijuana' does not include the seeds, stalks and

roots of the plant." *Former* ORS 475.302(10) (2001), *renumbered as* ORS 475.302(11) (2005).

On October 18, 2002, Trooper Stone of the Oregon State Police obtained a warrant to search the home of defendants Michael and Amber Castilleja, who are husband and wife and who both held medical marijuana cards at the time. The sufficiency of the affidavit supporting the request for the warrant forms the basis of this appeal, so the facts that we recite here are drawn from the affidavit. The first part of the affidavit sets forth in a general fashion Stone's training and experience. Stone stated that, in his 12 years as a police officer, he had received extensive training in the investigation of controlled substances and had participated in obtaining or executing search warrants for at least 15 marijuana-growing operations. Among other things, he stated that his "observations of marijuana include both the sight and smell of it growing and dried and marijuana in its various stages of processing." Nothing in his statement of training and experience indicates how much usable marijuana could be obtained as a result of processing a marijuana plant or how long it takes to process a plant into dried, usable marijuana.

Stone stated in the affidavit that he was called to defendants' home shortly after midnight on October 7, 2002. The police were summoned there after Michael was shot by intruders who were apparently attempting to steal defendants' marijuana plants. Both defendants had gone to the hospital when Stone arrived at the scene. Officers who were already there told Stone that there were six mature marijuana plants growing in a greenhouse as well as other plants growing behind the house. Stone noted in the affidavit that the number of plants growing was within the number allowed by the OMMA. He attached a copy of the OMMA to the affidavit as an exhibit and stated, "I know that the Oregon Medical Marijuana law allows for a card holder to have three mature marijuana plants and four immature marijuana plants and that a card holder may possess up to one processed ounce of marijuana per mature plant at the grow[ing] site." He also stated that he called the Oregon Health Division (OHD) and verified that both defendants had valid medical marijuana cards.

The affidavit also states that Stone spoke with Amber's mother, Loewen, at defendants' home on the night of the shooting. Loewen told the officers that Amber had called her after Michael was shot and had asked her to take defendants' children to her home. Stone described what Loewen told him as follows:

"[Loewen] was very upset and told me she knows Amber and Michael have medical marijuana permits but added that she knew they were way over their lawful allowable amounts. [Loewen] then said it was her understanding that Michael Castilleja's medical marijuana permit was expired or revoked but she did not know for sure. [Loewen] told me she believed there was a lot more than medical marijuana going on at the Castilleja residence. When I asked what she meant, [Loewen] said that Michael Castilleja has not worked in a couple of years and her daughter works for minimum wage, yet they have lots of stuff. [Loewen] told me there were boxes of brand new stereo equipment stacked in Michael and Amber's closet. [Loewen] told me she knows what has been going on because she had once been a drug dealer and was familiar with controlled substances and the signs that go along with drug dealing, as well as the effects that drug dealing has on children. [Loewen] told me she stopped dealing drugs when her children were very young after her daughter was nearly shot during a search warrant service at her home.

"[Loewen] said she knows that Amber and Michael were not supposed to have more than three ounces of marijuana apiece in addition to the growing marijuana. [Loewen] told me there was two pounds of marijuana in her daughter's bedroom in the closet as well as marijuana all over the house, indicating there was marijuana on the floor and marijuana drying in the back of the residence. [Loewen] told me the two pounds of marijuana in Amber and Michael's bedroom closet was in two large plastic bags."

The affidavit also states that, on October 14, 2002, Stone learned that a man named Morrison had been arrested in McMinnville in defendants' car with nine ounces of "processed marijuana." Stone called OHD again and was informed that Morrison was Michael's designated primary caregiver.[1]

---

[1] ORS 475.312 allows a medical marijuana cardholder to designate a primary caregiver. That person may assist in the medical use of marijuana and may

Stone also stated in the affidavit that, on October 17, 2002, he spoke with Detectives Rosario and Ludwig. Rosario told Stone that, on the night of the shooting, Loewen had invited him into the house and had given him information similar to what she told Stone about the possibly expired medical marijuana card and that marijuana was "all over the house." Rosario and Ludwig also told Stone that they had returned to defendants' home later in the morning on October 7 to interview Amber about the shooting. They told him that they noticed that the plants that had been seen earlier in the greenhouse had been harvested and were in three clothes baskets inside the house. Rosario told Stone that the baskets "appeared to contain the stems with the marijuana bud on them." He estimated that there were "approximately three pounds [of] marijuana in the baskets." Rosario also told Stone that he saw numerous pipes and other smoking paraphernalia in the living room while talking to Amber.

According to the affidavit, Stone spoke with Rosario again the next day. Rosario told him that he had returned to defendants' house again the day before to interview Michael about the shooting. He told Stone that, while he was there, he "observed a box in the residence that was full of bare marijuana stems."

Stone next stated:

> "I know based on my training and experience that the average mature marijuana plant will produce approximately a pound of marijuana. I further know that mature marijuana plants can produce well over a pound of marijuana depending on the plant and the skill of the grower. I further believe based on my training and experience that the plants being grown at the Castilleja residence were capable of producing a pound or more of marijuana."

The affidavit also includes information indicating that Stone and Rosario had seen other marijuana in the house on the night that Michael was shot, but, as we explain below, the trial court excised that information from the affidavit after ruling that their observations were made during

---

manufacture and possess marijuana as long as the cardholder and the designated primary caregiver do not collectively possess more than the cardholder alone may possess. *See* ORS 475.306(1) (2001); ORS 475.320 (2005).

an unlawful warrantless entry into defendants' home. The state does not challenge that ruling on appeal, so the details of that information are not material here.

Stone concluded the affidavit by stating that he had probable cause to believe that evidence would be found on defendants' property related to manufacture, possession, and delivery of a controlled substance, conspiracy to commit those offenses, endangering the welfare of a minor, and money laundering.

The search warrant was issued on October 18, 2002, and was executed three days later. According to the evidence receipt attached to the return of warrant, they seized nearly 20 pounds of marijuana. Defendants were charged with manufacture and possession of a controlled substance as well as child neglect and endangering the welfare of a child. Michael was also charged with two counts of delivery of a controlled substance.

Amber filed a pretrial motion to suppress "all evidence obtained as the result of an unlawful warrantless search" of defendants' home and all derivative evidence. She also moved to controvert the affidavit, arguing that Stone had left information out of the affidavit that would have affected the magistrate's decision to issue the warrant. Michael joined in those motions. The trial court decided to hear the motions separately, concluding that, if it granted the motion to suppress based on the warrantless search of defendants' home, there would be no need to hear the motion to controvert. At the hearing on the motion to suppress, defendants argued that the initial police entry into their home on October 7 constituted a warrantless search because defendants had not consented to their entry. They contended that none of the observations made in their house that night should have been included in the search warrant affidavit.[2]

The trial court agreed. To determine whether the evidence found upon execution of the search warrant was independent of the unlawful entry into defendants' home, the court first excised from the affidavit all information related to

---

[2] Defendants did not argue that the information concerning the marijuana plants in the greenhouse and behind the residence was subject to being excised.

the observations made by the police during that entry and then analyzed the remaining information to determine whether it furnished probable cause to issue a search warrant. Defendants argued to the court, among other things, that the OMMA does not limit the possession of unusable marijuana and that the affidavit did not establish that any of the marijuana seen in their house was usable. In response, the state did not argue that the OMMA *does* limit possession of unusable marijuana. Rather, it argued that Stone's affidavit demonstrated that defendants possessed more than the six ounces of marijuana permitted by the OMMA.

The court concluded that the affidavit did not furnish probable cause to search defendants' property. It concluded that the marijuana that Morrison was arrested with did not contribute to probable cause, because, in the court's view, "it's [not] too far a stretch to presume that this was marijuana that belonged to Mr. Morrison. It was with him. It was in his possession." With respect to Loewen's statements, the court found that she lacked veracity and that the affidavit did not establish the basis of her knowledge or that the marijuana that she told the police about was usable. The court doubted Loewen's veracity in part because she had been mistaken about the status of Michael's medical marijuana card. It stated, "[T]he manner in which she presented the statements [about the card] and the information that she had, I think painted her as being maybe somewhat less than neutral on the issue."

The court also found insufficient the information regarding the freshly harvested marijuana that Rosario and Ludwig had seen. It stated, "[T]here's nothing to tell me what this three pounds of harvested marijuana would have turned into in terms of usable marijuana, or whether [defendants] would have actually kept that in their possession or done something else with it if they determined that it was too much." After excising the unlawfully obtained information, the court determined that the affidavit did not support probable cause. It therefore granted defendants' motion to suppress.[3]

---

[3] Because the trial court granted defendants' motion to suppress, it did not hold a hearing on or rule on their motion to controvert the affidavit.

On appeal, the state argues that the trial court erred because it failed to defer to the issuing magistrate's probable cause determination. It argues that both Loewen's and Rosario's statements in the affidavit were sufficient to allow a reasonable person to believe that more than six ounces of usable marijuana—the maximum amount allowed under the OMMA at the time for two medical marijuana cardholders—would probably be found at defendants' home.[4] The state also contends that probable cause was supported by the fact that Morrison was arrested with nine ounces of marijuana in defendants' car.[5]

Defendants respond that, because the trial court excised information in the affidavit, it was not required to defer to the magistrate's probable cause determination. They also argue that the affidavit did not furnish a reason to believe that any of the marijuana in their house was usable or that it would have yielded more than six ounces of usable marijuana by the time the warrant was issued. Michael also cross-assigns error to the trial court's refusal to excise additional statements from the affidavit.

We begin with the parties' arguments concerning deference to the magistrate's probable cause determination because the issue implicates our standard of review. Probable cause exists if the issuing magistrate "could reasonably conclude that seizable things probably will be found in the place to be searched." *State v. Apolo*, 126 Or App 652, 656, 870 P2d 243, *rev den*, 319 Or 81 (1994). Ordinarily, review of an application for a search warrant is "limited to determining whether, on the basis of the information contained in the application for the warrant, a neutral and detached magistrate could have concluded that there was probable cause * * *." *State v. Binner*, 128 Or App 639, 645, 877 P2d 642, *rev den*, 320 Or 325 (1994). "In testing an affidavit, a court is to

[4] The state does not argue that the affidavit included sufficient information to furnish probable cause to believe that evidence related to endangering the welfare of a child or money laundering would be found. Accordingly, we do not consider the sufficiency of the affidavit in those respects.

[5] The state also argues that probable cause is supported by a statement in the affidavit indicating that Amber had told Rosario that defendants always have marijuana in the car. However, the trial court excised that statement from the affidavit, so we do not consider it.

construe it, in a commonsense, nontechnical, and realistic fashion looking at the facts recited and the reasonable inferences that can be drawn from those [facts]." *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001) (citation omitted; brackets in *Wilson*). "Because of the preference for warranted searches over those conducted without prior judicial authorization, doubtful cases are to be resolved by deferring to an issuing magistrate's determination of probable cause." *Id.*

■ However, when an application for a search warrant includes constitutionally tainted information, a reviewing court must excise that information and determine whether the remaining information in the application furnishes probable cause. That is so because the purpose of the exclusionary rule under Article I, section 9, of the Oregon Constitution is to restore the defendant to the position he or she would have been in had the police stayed within the law. *State v. Hall*, 339 Or 7, 24, 115 P3d 908 (2005). Thus, evidence discovered after unlawful police conduct is not subject to suppression if the evidence did not derive from the unlawful conduct. *Id.* at 25. If a defendant establishes a "but for" connection between the police illegality and the evidence, the state may show that the evidence did not derive from the unlawful conduct by showing that the police obtained it independently of the unlawful conduct. *Id.*

■ Where evidence was discovered by means of a search warrant that included unlawfully obtained information, the evidence is independent of the unlawful conduct if the lawfully obtained information in the search warrant application by itself established probable cause to issue the warrant. *See Binner*, 128 Or App at 645-46 ("That an application for a warrant contains some information that was obtained in violation of a defendant's constitutional rights does not compel the conclusion that the search conducted pursuant to that warrant was invalid."). As we explained in *Binner*, "[w]hen an application includes constitutionally tainted information, the correct action is for the magistrate and reviewing court to excise from the application all such information and to determine whether the remaining information is sufficient to establish probable cause." *Id.* at 646.

When the police illegality is not revealed until after the warrant has been executed—in other words, until the case is before a trial court—the trial court essentially steps into the shoes of the magistrate and determines whether the lawfully obtained information in the affidavit supports issuance of a warrant. *See State v. Harp*, 299 Or 1, 10, 697 P2d 548 (1985) (when the magistrate's decision to issue a warrant was the product of "faulty information," the sufficiency of the affidavit must be assessed by the reviewing court independently of the magistrate's decision).[6] In doing so, the court goes through the same process that a magistrate does, which includes fact-finding, *see* ORS 133.555. The court must determine whether the affidavit in its totality establishes probable cause. *State v. Culley*, 198 Or App 366, 373, 108 P3d 1179 (2005). If the lawfully obtained information in the affidavit is sufficient to furnish probable cause to issue a search warrant, then any evidence found pursuant to the warrant is independent of the police illegality and thus is not subject to suppression. *Binner*, 128 Or App at 646.

In this case, the trial court ruled that the initial police entry into defendants' home was an unlawful warrantless search under Article I, section 9, a ruling that the state does not challenge. The court therefore excised from the affidavit all information derived from the initial entry.[7] Given

---

[6] Judge Edmonds asserts that, after a reviewing court excises information from an affidavit, it reviews "the remaining information in the affidavit for probable cause, as it would have done had no portions of the affidavit been excised." 215 Or App at 260 (Edmonds, J., dissenting). However, the review that the court performs after excising information is not the same as the review of an affidavit that has had nothing excised. If no information has been excised, the court accepts all reasonable inferences that the issuing magistrate might have made in support of issuing the warrant. If information has been excised, the court tests the affidavit anew, independently of the magistrate's decision.

[7] Judge Edmonds expresses some uncertainty as to how the trial court proceeded, and he assumes that the court evaluated Loewen's veracity as part of the excising procedure. *See* 215 Or App at 260-61 (Edmonds, J., dissenting). That is incorrect. The pertinent events unfolded as follows: (1) Defendants filed a motion to suppress all evidence derived from the warrantless search of their home and a separate motion to controvert alleging that Stone had left relevant information out of the affidavit. (2) The court held a hearing on the motion to suppress in order to determine the legality of the warrantless search. (3) The court concluded that the search was unlawful. (4) The court excised from the affidavit all information based on observations made during the warrantless search. (5) The court analyzed the

that the affidavit had included tainted information, the court was correct in reviewing it independently of the magistrate's decision. We reject the state's assertion that the trial court erred by failing to defer to the magistrate's determination that probable cause existed.

We turn to the parties' arguments as to whether the affidavit, as excised, furnished probable cause. It is important to note what the parties—in particular, the state—do and do not argue. The parties frame their arguments exclusively in terms of whether the affidavit demonstrated probable cause to believe that defendants possessed more than six ounces of *usable* marijuana as defined in the OMMA. Conversely, the state did not raise before the trial court—and does not advance on appeal—either or both of two arguments that Judge Edmonds now invokes in his dissent. First, the state has never contended that, because medical marijuana is an affirmative defense, it was sufficient for the affidavit to demonstrate probable cause to believe that defendants possessed any amount of marijuana.[8] Second, the state has never contended that possession of any amount over six ounces was unlawful, even if the marijuana was not usable,

remaining information in the affidavit to determine whether it established probable cause. (6) As part of that analysis, the court found that Loewen's statements were unreliable or unhelpful and thus added little or no weight to probable cause. (7) The court concluded that the affidavit did not establish probable cause. The court did not hold a hearing on, or rule on, the motion to controvert, and it did not excise any information pursuant to ORS 133.693. Judge Edmonds's discussion under that statute, *see* 215 Or App at 261-64 (Edmonds, J., dissenting), is simply not germane to what actually happened in this case.

[8] In Judge Edmonds's view, the proposition that a search warrant affidavit need not negate a statutorily provided affirmative defense constitutes an argument as to why explicit references to amounts of usable marijuana in search warrant affidavits are not required. 215 Or App at 269-70 (Edmonds, J., dissenting). In support of that argument, he asserts that this court "has a duty to correctly interpret the meaning and the application of statutes that govern the issue, whether or not a particular statute is relied on by the parties." *Id.* at 269 n 9. We have no quarrel with that assertion, but our duty to correctly construe and apply statutes does not extend to making the parties' arguments for them, even if the arguments are statutorily based. *See State v. Walker*, 192 Or App 535, 542, 86 P3d 690, *rev den*, 337 Or 327 (2004) ("The state plainly put in issue the proper construction of the statute. That is all that is required. * * * *Once the construction of the statute is before us*, we have an obligation to arrive at the correct construction, regardless of the parties' arguments." (Emphasis added.)). The proposition that a search warrant affidavit need not negate an affirmative defense, even if a valid argument, is not an argument that the state advanced either at trial or in this court.

and, therefore, that it was sufficient for the affidavit to show that defendants probably possessed more than six ounces of any marijuana—usable or not.[9] Because it would be inappropriate to reverse the trial court on grounds that were neither preserved in that court nor presented to us by the parties on appeal, we voice no opinion on those issues.

■ Rather, adhering to fundamental precepts of preservation, we address the propriety of suppression as that issue was framed in the trial court and has been presented to us on appeal.[10] We consider only whether the affidavit demonstrated that defendants likely possessed more than six ounces of *usable* marijuana.

■ Our standard of review dictates our conclusion. When, as here, the trial court has excised information from the affidavit, that court resolves the sufficiency of the warrant independently of the decision of the magistrate who issued the warrant and, thus, on appeal, there is no occasion for deference to the issuing magistrate's decision. *Culley*, 198 Or App at 373. In other words, like the trial court, we are not required to draw all reasonable inferences that are consistent with the magistrate's decision. Instead, we are bound by the *trial court's* factual findings, including reasonable inferences that it drew, as long as there is evidence to support them. *Id.*

---

[9] Judge Edmonds contends that the state both preserved that argument in the trial court and advances it on appeal. 215 Or App at 269 n 9 (Edmonds, J., dissenting). We do not agree that the state adequately preserved any such argument at trial, but, in all events, any discussion of preservation on that point would be purely academic because the state does not advance that argument on appeal. According to Judge Edmonds, the state expressly argues in its brief to this court that "explicit references to amounts of 'usable marijuana' were not required to justify the search warrant." *Id.* Judge Edmonds takes that argument out of context. The point of the state's argument is that it is implicit in the affidavit that the marijuana was usable, not that usability is irrelevant. The other sentence that the dissent quotes from the state's brief demonstrates that that is the state's point: " '[t]he affidavit in this case provided probable cause to believe that defendants possessed more than six ounces of *usable* marijuana.' " *Id.* (Brackets in Judge Edmonds's opinion; emphasis added.) Nowhere in its brief does the state argue that usability is irrelevant.

[10] "[A]lthough it is axiomatic that we may affirm on grounds not argued to the trial court, there is no authority for the proposition that, without invoking 'plain error,' we can *reverse* the trial court on grounds not argued to it." *State ex rel Juv. Dept. v. Pfaff*, 164 Or App 470, 480 n 6, 994 P2d 147 (1999), *rev den*, 331 Or 193 (2000) (emphasis in original). The state does not argue that the trial court committed plain error.

at 374. "Normally, in the absence of other indications of the trial court's findings, we resolve all disputed factual issues to support its ultimate conclusion." *State v. Pelster/Boyer*, 172 Or App 596, 599 n 2, 21 P3d 106, *rev den*, 332 Or 632 (2001). "On appeal, we do not decide whether we would draw the same inference if we were the factfinder. We ask only whether that inference is one that the trial court reasonably could draw based on the record before it." *Culley*, 198 Or App at 374. Thus, when, as here, the trial court has determined that a search warrant application does not establish probable cause, we are bound by the court's factual findings and all reasonable inferences that are consistent with that conclusion.

In reaching the ultimate conclusion that the affidavit did not demonstrate probable cause, the trial court necessarily determined that the affidavit failed to show that defendants probably had more than six ounces of usable marijuana in their home. We are bound by that determination if any evidence in the record supports it. *See State v. Johnson*, 335 Or 511, 523, 73 P3d 282 (2003) ("[W]e are bound by a trial court's 'finding' that a party's evidence is not sufficiently persuasive."); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) ("If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion * * *.").

The linchpin of our analysis of the trial court's determination is the distinction between "marijuana" as defined in the longstanding general prohibition of marijuana-related activities and "usable marijuana" as defined more recently in the OMMA. The general definition includes everything from viable seeds and growing plants to harvested plants in the drying process and fully dried leaves and flowers. ORS 475.005(16).[11] "Usable marijuana," on the other hand,

---

[11] ORS 475.005(16) provides:

"'Marijuana' means all parts of the plant Cannabis family Moraceae, whether growing or not; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any

includes only *dried* leaves and flowers and usable preparations or mixtures thereof. ORS 475.302(11).[12] Perhaps the most significant distinction is that the general definition of "marijuana" includes "wet" marijuana—that is, parts of the plant that have been harvested but are not yet dry—whereas "usable marijuana" does not. The three-ounce-per-cardholder limit on usable marijuana thus does not include wet marijuana. In fact, the OMMA places no weight limit at all on wet marijuana.[13] Thus, an affidavit that establishes that a medical marijuana cardholder possesses, for example, four ounces of "marijuana," without further elaboration as to the condition of the marijuana, is insufficient to demonstrate that the cardholder possesses more than three ounces of "usable marijuana." The affidavit must state facts demonstrating, either explicitly or implicitly, whether the marijuana is usable.

In this case, evidence in the record supports the trial court's determination that the information in Stone's affidavit did not establish that the marijuana in defendants' home was usable. We begin with Loewen's statement that defendants had "two pounds of marijuana" in the bedroom closet.[14] The trial court determined that her statement did not support probable cause because it found that she lacked veracity,[15] that the affidavit did not establish the basis of her

other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination."

[12] ORS 475.302(11) provides:

" 'Usable marijuana' means the dried leaves and flowers of the plant Cannabis family Moraceae, and any mixture or preparation thereof, that are appropriate for medical use as allowed in ORS 475.300 to 475.346. 'Usable marijuana' does not include the seeds, stalks and roots of the plant."

[13] The OMMA does not expressly authorize possession of wet marijuana. It may be that harvested marijuana continues to constitute a "plant" until it is dried and, thus, that possession of wet marijuana is both authorized and limited by the OMMA provision allowing a medical marijuana cardholder to possess up to four immature and three mature plants. That issue is not before us, so we express no opinion as to it. For present purposes, it is necessary only to note that wet marijuana does not constitute usable marijuana.

[14] Loewen also told Stone that defendants had marijuana "all over the house, indicating there was marijuana on the floor and marijuana drying in the back of the residence." That statement is unhelpful because it does not say whether the marijuana was, or could become, usable.

[15] Judge Edmonds asserts that a court has no authority to make veracity findings outside the context of a motion to controvert. *Castilleja*, 215 Or App at 260, 266 (Edmonds, J., dissenting). That is incorrect. As part of the general obligation to

knowledge, and that her statement failed to establish whether the marijuana was usable.

With respect to the issue of veracity, the state argues that Loewen never expressed any certainty that Michael's medical marijuana card was invalid and, therefore, that her statements about the card were merely inaccurate and not dishonest. Thus, according to the state, her statements about the card provided no basis for disregarding her other statements. We disagree. The trial court could reasonably infer that, although Loewen's statements were couched in terms of uncertainty, her intent was to mislead the police into thinking that Michael did not possess a valid medical marijuana card. Thus, we are bound by the trial court's finding that she lacked veracity.

Even if the determination that Loewen lacked veracity were not reasonable, the trial court could reasonably determine that the affidavit failed to establish that the marijuana in the closet probably was usable. The state argues that it is reasonable to infer that Loewen knew that defendants were limited to possessing six ounces of usable marijuana and, thus, in light of her statement that she knew that they were "way over" the legal limit, it is reasonable to infer that she had observed more than six ounces of usable marijuana. That argument, however, disregards our standard of review. As noted, the question is not whether the trial court could have drawn reasonable inferences that would support probable cause; rather, it is whether the inferences that the court did draw are reasonable. Again, our standard of review, properly understood and applied, compels affirmance.

According to the affidavit, Loewen told Stone that she knew that defendants were "not supposed to have more than three ounces of marijuana apiece in addition to the growing marijuana." Loewen did not state that she knew that they were limited to three ounces of *usable* marijuana apiece.

---

construe an affidavit in a "commonsense and realistic fashion" to determine from the totality of the circumstances whether there is probable cause, the court must determine pertinent factors such as the reliability and veracity of informants. *See State v. Johnson*, 340 Or 319, 329, 131 P3d 173 (2006); *Pelster/Boyer*, 172 Or App at 602; *State v. Milks/Sales*, 127 Or App 397, 401, 872 P2d 988 (1994) ("The trial court correctly concluded that [a named informant] could not be found to be a credible informant.").

Further, because the affidavit did not explain the basis of her purported knowledge of the limits of the OMMA, the trial court had no context for assessing whether she had an accurate understanding of the law.[16] The trial court could reasonably infer that Loewen harbored a mistaken belief that the OMMA limited possession to three ounces of *any* harvested marijuana—usable or not.

We fully appreciate that that is not the only reasonable inference that the trial court could have drawn—one could well have drawn the contrary inference. Nevertheless, given our standard of review, the availability of other reasonable inferences is immaterial. Thus, we reject the state's argument that Loewen's statement that she knew that defendants were "way over" the legal limit necessarily demonstrates that she had observed more than six ounces of usable marijuana.

In a related sense, the state argues that the only reasonable inference that can be drawn is that the bags that Loewen said were in the closet contained at least some usable marijuana; in the state's view, it is not reasonable to infer that defendants would have stored two pounds of entirely unusable marijuana in their closet rather than simply disposing of it. We disagree. Although we might not draw the same inference if we were reviewing the affidavit in the first instance, we cannot say that it was unreasonable for the trial court to infer that the marijuana in the closet was not usable. For example, it would not be unreasonable to infer that defendants, who legally grew and processed marijuana, would be saving the unusable marijuana in plastic bags for disposal at an appropriate time and place. Because the inference that the trial court made is reasonable, we are bound by it.

We turn next to the statements in the affidavit about the freshly harvested marijuana that Rosario and Ludwig saw in baskets in defendants' living room. The state argues

---

[16] Judge Edmonds asserts that Loewen had "personal experience with * * * the amount of marijuana permitted under the OMMA." 215 Or App at 272 (Edmonds, J., dissenting). The affidavit says nothing about how she obtained knowledge about the OMMA, let alone that she gained it through "personal experience."

that Rosario's estimate that defendants had about three pounds of marijuana, coupled with Stone's assertion that each plant was capable of producing a pound or more of marijuana, furnish probable cause to believe that defendants possessed an unlawful amount of marijuana. There are three problems with the state's argument. First, the affidavit says nothing about how long it takes freshly harvested marijuana to dry. Thus, it is not possible to determine whether the marijuana that Rosario and Ludwig saw would have been usable by the time Stone applied for the search warrant. Second, Stone never saw the marijuana in the living room, so his "training and experience"-based averment did not relate to any personally observed circumstances. Third, neither Rosario nor Stone said that the harvested marijuana would yield more than six ounces of usable marijuana. As the trial court stated, "there is nothing to tell [us] what this three pounds of harvested marijuana would have turned into in terms of usable marijuana * * *." It follows that the court could reasonably infer that it would not yield more than six ounces of usable marijuana.

We turn finally to the statements in the affidavit concerning Morrison and the nine ounces of marijuana that were in his possession when he was arrested. The trial court determined that the affidavit did not establish that the marijuana that Morrison was arrested with was connected with defendants. Nothing in the affidavit precludes the inference that Morrison obtained the marijuana from someone other than defendants, so the trial court's determination is reasonable, and we are bound by it on appeal. Information concerning marijuana that was not shown to have any connection with defendants cannot support probable cause to believe that other marijuana will more likely than not be found in defendants' home.

In sum, in light of the facts as the trial court found them, the affidavit did not establish probable cause to believe that, more likely than not, more than six ounces of usable marijuana would be found at defendants' home. We therefore reject the state's assignment of error to the trial court's order granting the motion to suppress. Because we reject the state's assignment of error, we need not address Michael's

cross-assignment of error to the trial court's refusal to excise additional information from the affidavit.

Affirmed.

**EDMONDS, J.,** dissenting.

The majority concludes that it is bound by the findings made by the trial court regarding the information from a named informant after the trial court excised portions of the affidavit submitted by the police in support of the issuance of a search warrant in this case. It thus affirms the trial court's suppression of evidence seized as a result of the execution of the search warrant. The majority applies the wrong standard of review when it uses the standard of review under *Ball v. Gladden*, 250 Or 285, 443 P2d 621 (1968), to analyze the trial court's decision. The *Ball v. Gladden* standard of review applies to historical factual findings and posits that, if the findings are supported by the evidence, a reviewing court will not disturb them. That standard of review is inapplicable to this case except with regard to defendants' motion to controvert under ORS 133.693. Once information is excised from an affidavit under ORS 133.693, the review by a reviewing court under ORS 133.673(1) is for probable cause; that is, the court must determine *"as a matter of law* 'whether a neutral and detached magistrate could conclude, based on the facts and circumstances shown by the affidavit, that there was probable cause to believe that the search would discover things specified in the affidavit in the places requested to be searched.'" *State v. Keerins*, 197 Or App 428, 432, 106 P3d 166, *rev den*, 338 Or 681 (2005) (quoting *State v. Villagran*, 294 Or 404, 408, 657 P2d 1223 (1983) (emphasis added)).

Not only does the majority fail to apply the correct standard of review on appeal, but it also fails to recognize that the trial court erred in the standards of review that it applied. First, the trial court erred in the manner in which it reviewed the affidavit after it had been excised.[1] Second, there is no evidentiary support for the trial court's finding

---

[1] Although the majority ostensibly applies the requirement that a reviewing court construe a search warrant affidavit "in a commonsense, nontechnical and realistic fashion," 215 Or App at 245 (quoting *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001), the complexity of the analysis in which it engages to conclude that the affidavit does not state probable cause belies that assertion.

regarding a named informant's lack of veracity. Third, the majority imposes a requirement on the state that the law does not require—a requirement that state must negate a defendant's potential affirmative defense in a search warrant affidavit in order to obtain a search warrant. For each of those reasons, as explained more fully below, the trial court's decision should be reversed.

The affidavit in support of the search warrant contains, among other things, the following averments by Trooper Stone, the author of the affidavit:

"I followed Detective Rosario into the residence via the back door because of evidence collection near the front entrance, and made contact with [defendant] Amber Castilleja's mother Connie [Loewen] in the living room. * * * [Loewen] said her daughter Amber called her and told her, [Loewen], that Michael had been shot and asked her to come get the children. [Loewen] was very upset and told me she knows Amber and Michael have medical marijuana permits but added that she knew they were way over their lawful allowable amounts. [Loewen] then said it was her understanding that Michael Castilleja's medical marijuana permit was expired or revoked but she did not know for sure. [Loewen] told me she believed there was a lot more than medical marijuana going on at the Castilleja residence. When I asked what she meant, [Loewen] said Michael Castilleja has not worked in a couple of years and her daughter works for minimum wage, yet they have lots of stuff. [Loewen] told me there were boxes of brand new stereo equipment stacked in Michael and Amber's closet. [Loewen] told me she knows what has been going on because she had once been a drug dealer and was familiar with controlled substances and the signs that go along with drug dealing, as well as the effects that drug dealing has on children. [Loewen] told me she stopped dealing drugs when her children were very young after her daughter was nearly shot during a search warrant service at her home."

The affidavit continued,

"[Loewen] said she knows that Amber and Michael were not supposed to have more than three ounces of marijuana apiece in addition to the growing marijuana. [Loewen] told me there was two pounds of marijuana in her daughter's bedroom in the closet as well as marijuana all over the

house, indicating there was marijuana on the floor and marijuana drying in the back of the residence. [Loewen] told me the two pounds of marijuana in Amber and Michael's bedroom closet was in two large plastic bags."

Defendants moved to suppress all the evidence obtained as the result of the execution of the search warrant. In response to the motion, the trial court excised what it concluded was unlawfully obtained information from the affidavit and then considered the remaining information. Ultimately, it held that the remaining information did not provide probable cause to issue the warrant. With regard to the information that Loewen furnished to Stone, the trial court ruled,

"THE COURT: Well, I basically went through the affidavit and picked out anything that I thought might potentially be argued as adding to probable cause, and to analyze each little bit of it independently.

"And to start, you know, the—what you just said, [prosecutor], about the proper thing to do, this is an affidavit and you take everything together, that is true.

"And in this case, in some respects, I think that tends to work against the State. And particularly with respect to the statements of Ms. Loewen. Because as I read the affidavit as a whole, I think that she was clearly upset about what she thought was going on.

"She was clearly mistaken in at least one regard, and that was with respect to Ms. Castilleja's license being revoked or lapsed. She was just flat wrong about that. And the manner in which she presented the statements and the information that she had, I think painted her as being maybe somewhat less than neutral on the issue. And I do frankly take that into account.

"* * * * *

"And then starting on page 9 you have Ms. Loewen's statements. To sort of list them here, she said she knew they were way over, referring to the amount of medical marijuana that the Castillejas should have.

"Later on she said she believed there was a lot more than medical marijuana going on. She also said that she understood that Michael's permit had expired or revoked,

which as I indicated, turns out not to be true per the Affiant's own knowledge and research that he's done.

"She also cited her own drug dealing experience. She indicated that she knew the signs of dealing, as well as what it does to children. And she stated further that she knows that the Castillejas couldn't make much money, but they had a lot of stuff, including new stereo equipment in boxes in the closet.

"I frankly don't find any of her statements there to add anything to probable cause. Again, and I have already mentioned that I think there's an issue of her own motives and veracity, as [defense counsel] pointed out.

"There's some guess work going on. It is too vague. She apparently stated to Detective Rosario that, and this is on page 11 of the affidavit, that she felt it was more than medical marijuana because, one, it was all over the house, and two, she thought that Michael's card had expired.

"So when she concluded that there was more than medical marijuana going on, I don't find that there was a basis of knowledge or particularly the veracity necessary for me to find that added anything to the probable cause analysis. And I don't find that those statements added anything.

"Of somewhat more concern was her statement about the two pounds in the closet. But again, I think that because of the veracity issue, and frankly the basis of her knowledge, and maybe to a lesser extent the issue of whether it was useable or not, I don't find that there is much there either in terms of probable cause."

On appeal, the state challenges the trial court's determination regarding Loewen's information, arguing that "[t]he trial court erred by deeming Loewen's veracity suspect." That argument implicates the provisions of ORS 133.673(1) and ORS 133.693. I begin with a discussion of those (and related) statutes, because it is those statutes that govern the trial court's authority in the context of motions to controvert and motions to suppress.

The issuance of search warrants is governed by ORS 133.525 through 133.619. ORS 133.555 provides for a hearing on an application for a search warrant. Subsection (1) of the statute authorizes the issuing judge to examine under

oath "the affiants, and the applicant and any other witnesses the applicant may produce" or that the judge considers necessary to a decision. Subsection (2) of the statute authorizes the court to make "findings" and to determine whether there is "probable cause to believe that the search will discover things specified in the application and subject to seizure under ORS 133.535." That grant of authority to the issuing judge permits the judge to disbelieve the testimony of a witness or to find that information in an affidavit is not reliable or credible.

Challenges to the use of evidence seized under authority of a warrant is, as noted, governed by ORS 133.673 and ORS 133.693. ORS 133.673(1) provides:

> "Objections to use in evidence of things seized in violation of any of the provisions of ORS 133.525 to 133.703 shall be made by a motion to suppress which shall be heard and determined by any department of the trial court in advance of trial."

ORS 133.693 permits a defendant, after the issuance and execution of a search warrant, to challenge the truthfulness of the information contained in the affidavit in support of the issuance of the warrant and governs the scope of the reviewing court's authority:

> "(1)  Subject to the provisions of subsection (2) of this section, in any proceeding on a motion to suppress evidence the moving party shall be entitled to contest, by cross-examination or offering evidence, the good faith, accuracy and truthfulness of the affiant with respect to the evidence presented to establish probable cause for search or seizure.
>
> "(2)  If the evidence sought to be suppressed was seized by authority of a search warrant, the moving party shall be allowed to contest the good faith, accuracy and truthfulness of the affiant as to the evidence presented before the issuing authority only upon supplementary motion, supported by affidavit, setting forth substantial basis for questioning such good faith, accuracy and truthfulness.
>
> "(3)  In any proceeding under subsection (2) of this section, the moving party shall have the burden of proving by a preponderance of the evidence that the evidence presented

before the issuing authority was not offered in good faith, was not accurate and was not truthful.

"(4)  Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution.

"(5)  The court shall determine whether, under applicable law, any inaccuracy, untruthfulness or lack of good faith requires suppression."

The trial court, as a reviewing court, had pending before it two motions—a motion to controvert under ORS 133.693(5) and a motion to suppress evidence under ORS 133.673(1) on the ground that the affidavit as excised did not provide probable cause for the issuance of a search warrant. A reviewing court's authority to construe the affidavit in determining whether to suppress evidence is circumscribed by the two statutes. ORS 133.693 provides the exclusive authority by which a reviewing court is authorized, based on controverting evidence, to draw inferences and find that the information furnished in a search warrant affidavit is inaccurate or untruthful. When a motion to controvert is filed, an evidentiary hearing is held pursuant to ORS 133.693(3). At the hearing, the defendant has the burden of proving by a preponderance of the evidence that the information presented to the issuing magistrate was not accurate, truthful, or made in good faith. Under ORS 133.693(5), a reviewing court is authorized to draw its own inferences from the evidentiary record before it and make findings of fact regarding the information presented to the issuing judge.[2]

But once information is excised from an affidavit pursuant to ORS 133.693, the court's remaining authority is governed by ORS 133.673(1). As we concluded in *State v. Pelster/Boyer*, 172 Or App 596, 21 P3d 106, *rev den*, 332 Or 632 (2001), the process contemplated by the statute is one of subtraction. *See State v. Harp*, 299 Or 1, 9-10, 697 P2d 548

---

[2] Indeed, each of the cases the majority cites for the proposition that it is "bound by the *trial court's* factual findings," 215 Or App at 248 (emphasis in original), addressed trial court findings made in the course of resolving a motion to controvert, not in making the probable cause determination discussed in the text below.

(1985) (describing process). Once the initial task of subtraction is performed pursuant to the motion to controvert under ORS 133.693, the reviewing court must review the remaining information in the affidavit for probable cause, as it would have done had no portions of the affidavit been excised. That is, the trial court becomes a reviewing court for the purpose of determining the existence of probable cause. In *Pelster/Boyer*, we explained the applicable standard of review that applies to the trial court's review after portions of the affidavit have been excised by it:

> "The statute [ORS 133.693] does not provide for removing information from an affidavit because it is irrelevant or legally insufficient; that remedy is available only if the information is inaccurate, untruthful, or not offered in good faith. Rather than excising irrelevant or legally insufficient information [from the affidavit], the trial court should have simply ignored it, because it does not contribute to a showing of probable cause. The information, however, remains part of the affidavit and on appeal we may conclude, contrary to the trial court, that the information is relevant or legally sufficient. If it is, we are free to consider the information in reviewing the trial court's decision."

172 Or App at 600.

Thus, under the procedure contemplated by ORS 133.673(1) and ORS 133.693, no fact-finding or inference-drawing occurs once information is excised from an affidavit. Rather, the reviewing court is to conduct "an evaluation of the sufficiency of the affidavit on the basis of the remaining accurate facts in the affidavit." *Harp*, 299 Or at 9. It is for that reason that the majority errs when it holds generally that we are bound by the trial court's findings of fact under *Ball v. Gladden*. That standard of review is applicable only to the trial court's rulings pursuant to defendants' motion to controvert under ORS 133.693. That is the first mistake that the majority makes in this case.

The determination of whether probable cause exists based on a reasonable person standard requires the reviewing court to view the remaining material objectively, not subjectively. *Harp*, 299 Or at 10. It does not appear from the record that the trial court applied an objective standard of probable cause to the remaining portions of the affidavit after

it excised portions of it. Indeed, the reviewing trial court may have ruled on both motions without properly understanding the differing standards of review that existed for the motions pending before it. For instance, the record does not indicate that the court ruled on the motion to controvert; yet, it is clear from the record that it excised information from the affidavit, an exercise of authority that could only have properly occurred under ORS 133.693, pursuant to the motion to controvert. To add to the mystery, it appears that, in excising portions of the affidavit unrelated to Loewen's testimony at the hearing on the motion to controvert, the trial court ruled, based on Loewen's "motives and veracity[,]" that Loewen's information did not "[add] anything to the probable cause analysis."

Because ORS 133.693 provides the exclusive grant of authority for the court to find information in the affidavit untruthful, it could be that the court intended to make its finding in that regard as part of the exercise of its authority to excise untruthful information from a search warrant affidavit.[3] On the other hand, it is also a possible interpretation of the record that, once the trial court excised portions of the affidavit, it failed to understand that its standard of review was to determine *as a matter of law* whether the remaining portions of the affidavit amounted to probable cause without any fact-finding or inference drawing on its part. The first part of the following analysis assumes that the trial court intended to act within its authorized scope of authority and to make its credibility finding under ORS 133.693. The second part of the analysis assumes that the court intended to make a credibility finding as part of its analysis of probable cause after portions of the affidavit were excised.

The first assumption implicates the following principles that the trial court was required to apply. The methodology prescribed by ORS 133.693 and the Supreme Court's decisions under the statute—including *Harp* and *State v. Keeney*, 323 Or 309, 317, 918 P2d 419 (1996)—is as follows:

---

[3] As explained more fully below, the statutes contemplate a distinction between information that is false or untrue and therefore subject to contravention, and information that a reviewing court could conclude does not add to probable cause because of its lack of relevance or other legal sufficiency.

"[T]he suppression judge begins with the affidavit(s) and record, if any, upon which the magistrate issued the warrant. ORS 133.555. The judge then evaluates whether the defendant has proven by a preponderance of evidence that the evidence upon which the magistrate relied was ['not offered in good faith, was not accurate and was not truthful.'] ORS 133.693(3). If the defendant proves inaccuracies, [untruthfulness or lack of good faith,] the judge must then assess the sufficiency of the affidavit on the basis of the remaining accurate facts in the affidavit."

*Harp*, 299 Or at 9.

Under the statute, it was defendants' burden to prove by a preponderance of the evidence that the information Loewen gave to Stone about the two pounds of marijuana was not offered in good faith, was not accurate, or was not truthful. Before the trial court, for its determination under the statute, were the remaining contents of the affidavit and the testimony adduced at the hearing on the motion to controvert. In light of that record, the question becomes whether we are bound by the trial court's conclusion that the information that Loewen gave to Stone does not amount to probable cause for the issuance of the warrant.

To answer that question, it is important to parse the words of the statute. Each term in ORS 133.693 has a distinct meaning. *Keeney*, 323 Or at 316. "[T]he word 'untruthfulness' in ORS 133.693(5) refers to dishonesty, rather than inaccuracy" of factual perceptions in an affidavit in support of a search warrant. *Id.* The distinction between information that is inaccurate and information that is the product of dishonesty is important because a mere "demonstration that an affiant has supplied inaccurate information in a search warrant furnishes no reason for the court to conclude that the affiant's remaining factual assertions also are inaccurate, in the absence of some showing to support that conclusion." *Id.* at 319. On the other hand, if a defendant proves that the affiant or an informant lied, then based on the common-law maxim, "false in one thing, false in everything," a trial court could conclude that it should give no weight to the affiant's information because the person or the information is deemed not to be credible. The notion underlying the distinction between a conscious falsehood and a mistake is that "a person may err

in memory or observation or skill upon one point and yet be competent upon others, yet a person who once deliberately misstates, one who goes contrary to his own knowledge or belief, is equally likely to do the same repeatedly and is not to be reckoned with at all." *Simpson v. Miller*, 57 Or 61, 63, 11 P 485 (1910) (internal quotation marks and citation omitted). Based on those principles, the question is whether there was evidence adduced at the hearing on the motion to controvert that supports a finding that Loewen's information was deliberately false. That inquiry is subject to a *Ball v. Gladden* kind of standard of review, but it is properly applicable only to historical findings made under ORS 133.693 and not to legal conclusions made under ORS 133.673(1).

Three witnesses, Stone, another police officer, and Loewen testified in the suppression hearing. No witness in the hearing was asked about Loewen's statements to Stone that there were two pounds of marijuana in defendants' bedroom in the closet, nor did that subject ever arise in the hearing; the subject simply did not come up. Although the officers were examined in the suppression hearing about their contacts with Loewen, they were not asked about the information that she gave them. Loewen's testimony at the suppression hearing was relatively brief. She was asked about her relationship to defendants and their children. She testified that her daughter asked her to come to the residence on the day in question to care for defendants' children after Michael Castilleja had been shot. When asked how often she had been in the residence, she replied, "Maybe, once a month." She also testified that she had had conversations with the police after Michael Castilleja was taken away for medical treatment.

On cross-examination, Loewen was asked about the number of officers that were at the scene, the medical team that was treating her son-in-law, whether her husband came into the house, and whether she had a key to the house. Defendants did not seek to impeach her testimony in any manner during their cross-examination. The only evidence of any inaccuracy in the information that Loewen gave to Stone is her mistaken belief that Michael Castilleja's medical marijuana card was revoked or expired. But even Loewen herself had told Stone that "she did not know for sure" whether the card was revoked or expired.

The trial court gave three reasons why it discounted Loewen's information. It found that Loewen was not believable, that the basis of her knowledge of the marijuana in the closet was not demonstrated in the affidavit, and that there was no showing in the affidavit that the marijuana was "usable" within the meaning of the Oregon Medical Marijuana Act (OMMA). First, with regard to the issue of Loewen's veracity, the trial court correctly found that Loewen was mistaken regarding whether defendants were current medical marijuana cardholders. However, to the extent that the trial court inferred from that fact that the other information Loewen gave to Stone was not believable, such an inference was not a permissible inference under *Keeney* because there was no evidence in the hearing before the trial court that Loewen deliberately misled or lied to Stone. Such an inference is especially unfounded in light of the fact that Loewen told Stone that she could be mistaken in that regard. The only permissible inference from the record is that Loewen was mistaken about whether her son-in-law had a current permit to possess marijuana for medical purposes. Moreover, despite the trial court's decision to the contrary, there is no evidence of improper "motives" that would have prompted Loewen to lie to the police officers. Indeed, there was no evidence whatsoever adduced in the suppression hearing about her motives. The affidavit reveals that she was concerned about the welfare of her grandchildren, but that fact is not a fact from which it can be reasonably inferred that she told the officers falsehoods. Because there is no evidence in the record that could give rise to a reasonable inference that Loewen deliberately lied to Stone, the trial court was without authority under ORS 133.693 to "subtract" Loewen's information from the affidavit on that basis.

On the other hand, if the trial court intended to make its finding regarding the veracity of Loewen's information as part of its review of the excised affidavit under ORS 133.673(1), then it exceeded its authority under the applicable standard of review. Once the affidavit was excised, the trial court had (and this court, for that matter, has) no authority to draw any factual inferences regarding the veracity of Loewen's information because there is nothing in the

remaining portions of the affidavit that impeaches her veracity.[4] Any fact-finding inquiry by the trial court was over with at that point in the analysis. The proper inquiry, as we stated in *Pelster/Boyer*, was whether—as a matter of law, from a reasonable person's viewpoint—the information was objectively relevant to probable cause and legally sufficient to establish probable cause. Consequently, the trial court's finding that Loewen's information lacked veracity was not a finding that it was authorized to make under ORS 133.673(1). Rather, the standard of review the trial court should have applied at that point was to afford a common-sense, objective reading to the remaining portions of the affidavit. *See State v. Wilson*, 178 Or App 163, 167-68, 35 P3d 1111 (2001) (holding that, after deleting information under ORS 133.693 and deleting inferences that are reasonable on the face of the affidavit but that would not have been reasonable if the deleted information in the affidavit had not existed in the affidavit, the reviewing court tests the remaining information for probable cause).[5]

---

[4] Some examples help to illustrate the difference between excising information from the affidavit pursuant to ORS 133.693 so that it no longer is included in the affidavit and information that remains in the affidavit after it is excised but is not relevant to or legally insufficient to the issue of whether probable cause exists. Suppose that an excised affidavit contained information from an unnamed informant that was not supported by information about the reliability of the informant or the information, or that it appeared from the information in the affidavit that the person furnishing the information was delusional. A reviewing court could properly disregard that information because, under a reasonable person standard, the information is not reliable enough to establish probable cause. Alternatively, suppose that the information that came from the informant was contrary to established facts in the affidavit or unrelated to the issue of probable cause. The trial court could also properly disregard that information because a reasonable person would not consider such evidence in assessing the question of probable cause. For example, in this case, Loewen professed a belief that Michael Castelleja's medical marijuana card had expired but acknowledged that she could have been mistaken. Other information in the affidavit demonstrated her belief to be incorrect. Under those circumstances, a reviewing court should properly ignore Loewen's belief. However, the remainder of Loewen's information in the affidavit lacks any basis for impeachment. In sum, the proper test to apply is an objective test—whether a reasonable person, in light of the information provided and reasonable inferences that could be drawn from the information, would consider the information probative of probable cause.

[5] The majority insists that the trial court may make credibility findings when it performs its reviewing function under ORS 133.673(1), 215 Or App at 250-51 n 15; I disagree for the reasons expressed above. But, even assuming that the trial court could make such findings in its "four-corners" review of the remaining

Thus, it is clear that the majority errs for two reasons when it concludes that we must affirm because of the trial court's finding of fact regarding Loewen's veracity. If the trial court made its veracity finding under ORS 133.693, that finding is not supported by the evidence. If the trial court purported to make its veracity finding under ORS 133.673(1), then it had no authority to do so under that statute. As a reviewing court, we are charged with applying the two statutes correctly. That requires us to make an objective evaluation of the remaining portions of the excised affidavit without taking into account the trial court's veracity finding, and when that analysis is made (as explained more fully below), it is apparent that the remaining portions of the affidavit provided probable cause to search defendants' residence.

The other reasons given by the trial court for its discounting of Loewen's information—Loewen's basis of knowledge and that there was no showing in the affidavit that the marijuana was usable—were appropriate considerations for the trial court and for us under ORS 133.673(1). The trial court, however, erred when it based its conclusion to not consider Loewen's information about the marijuana in the closet, in part, because of the purported failure of the affidavit to disclose "the basis of her knowledge." Loewen is a named informant who was present in the house when the police first arrived. Information from a named informant carries with it inherent indicia of reliability, because a person who gives false information to a police officer exposes himself or herself to criminal liability. *See State v. Montigue*, 288 Or 359, 363-67, 605 P2d 656 (1980) (discussing reasons for deeming information from named informants reliable). Loewen's daughter, son-in-law, and grandchildren lived in the residence, and Loewen expressed knowledge regarding their employment status and their purchasing habits. When asked how often she had been present in defendants' residence, she replied, "Maybe once a month." Loewen also gave Stone detailed

portions of the search warrant affidavit and made no rulings under ORS 133.693, the majority errs in asserting that this court owes any deference to those determinations. The majority never explains why the trial court, in reviewing the remaining portions of the affidavit for legal sufficiency, was in any better position than is this court in determining whether—*as a matter of law*—the remaining portion of the affidavit supplied the issuing court with probable cause.

information about the location of the "two pounds of marijuana" in defendant's closet and that it was packaged in "two large plastic bags." All of the above information, when considered together, makes it more likely than not that Loewen's report to Stone was based on first-hand information. In that light, the trial court was clearly wrong when it opined that the affidavit was defective because it failed to demonstrate Loewen's basis of knowledge.

The trial court also ruled that the affidavit was insufficient because it did not provide probable cause to believe that defendants possessed "usable" amounts exceeding the amounts that the OMMA permits medical marijuana cardholders to possess. The trial court's apparent focus on Loewen's failure to refer to "usable" marijuana does not take a realistic view of the officer's conversation with Loewen. "Usable" marijuana is a defined statutory term for purposes of the OMMA, rather than a term of ordinary parlance. In her statements to the police, Loewen referred to "marijuana," "growing marijuana," and marijuana that was "drying." When Loewen's references to growing and drying marijuana are read in context with her statement regarding the two pounds of marijuana in the closet packaged in two plastic bags and with her statement that defendants were not permitted by the OMMA to have more than three ounces of marijuana each, in addition to the growing marijuana, the only reasonable inference to be drawn is that she was referring to dried marijuana in the closet that was available for use or distribution.[6] In sum, when all of Loewen's statements are read together, it is more likely than not that more than six ounces of dried, usable marijuana would be found at defendants' residence.[7]

---

[6] The law is clear that the state is not required to disprove every unlikely scenario in order to demonstrate probable cause. It is certainly unlikely that a person would store *wet* marijuana in plastic bags in his or her closet.

[7] The facts in this case are analogous to the facts in *State v. Thomas*, 7 Or App 50, 489 P2d 962 (1971), in which we reversed the trial court's suppression of the evidence for lack of probable cause. In that case, the informant, based on his experience, was able to recognize marijuana, and he observed "a quantity in excess of two kilos" at the place to be searched and other activities consistent with his experience with narcotics. We held that those facts constituted probable cause to search the premises. Similarly, Loewen's statement to the affiant that she saw two pounds of marijuana in plastic bags in defendants' closet gives rise to probable cause.

The trial court's conclusion was also incorrect in light of the structure of the OMMA. Under *former* ORS 475.992(4)(f) (2001), *renumbered as* ORS 475.864 (2005), it is a Class B felony for any person to knowingly or intentionally possess more than one ounce of marijuana as defined by ORS 475.005(16). For purposes of that statute,

> " 'Marijuana' means all parts of the plant Cannabis family Moraceae, whether growing or not; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination."

The OMMA is codified at ORS 475.300 to 475.346.[8] Its purpose in relation to the provisions of *former* ORS 475.992 is expressed in ORS 475.300(4) and ORS 475.342. ORS 475.300(4) provides that

> "ORS 475.300 to 475.346 are intended to make only those changes to existing Oregon laws that are necessary to protect patients and their doctors from criminal and civil penalties, and are not intended to change current civil and criminal laws governing the use of marijuana for nonmedical purposes."

ORS 475.342 provides that "nothing in ORS 475.300 to 475.346 shall protect a person from a criminal cause of action based on possession, production or delivery of marijuana that is not authorized by ORS 475.300 to 475.346." Thus, under those provisions, the law of search and seizure as it applies to *former* ORS 475.992 remains the same as it existed before the enactment of the OMMA.

---

[8] Because the 2001 version of the OMMA was in effect at the time of the search in this case, all references herein are to the 2001 versions of the statutes unless otherwise noted.

Rather than providing complete immunity for possession of marijuana for medical purposes, the OMMA furnishes a potential *affirmative defense* to a criminal prosecution for possession of marijuana.[9] ORS 475.319(1) provides:

"Except as provided in ORS 475.316 [addressing limitations on cardholder's use of medical marijuana] and 475.342, it is an affirmative defense to a criminal charge of possession or production of marijuana, or any other criminal offense in which possession or production of marijuana is an element, that the person charged with the offense is a person who:

"(a)   Has been diagnosed with a debilitating medical condition within 12 months prior to arrest and been advised by his or her attending physician that the medical use of

---

[9] Curiously, the majority contends that the state has not preserved for purposes of appeal under ORAP 5.45 the issue whether the affiant must demonstrate that the two pounds of marijuana in the closet was "usable" within the meaning of OMMA. *See* 215 Or App at 247 n 8. However, the prosecutor argued to the trial court that, regarding

"counsel's argument on usable marijuana, it is the State's position that, if anything, that's a legal fine point that doesn't go to whether the officers had the authority for the quote search and seizure that underlies the affidavit. The officers are operating under a standard of probable cause. What counsel is alluding to is a legal issue outside of a probable cause analysis."

Indeed, the trial court understood and ruled on the issue, concluding that one of the reasons for discounting Loewen's information was the lack of a showing that it was not "usable marijuana." Moreover, the state expressly argued in its brief to this court that, under the applicable statutes, "[t]he affidavit in this case provided probable cause to believe that defendants possessed more than six ounces of usable marijuana" and that "explicit references to amounts of 'usable marijuana' were not required to justify the search warrant." The majority is correct that the state did not make the argument that the affidavit need not negate a statutorily provided affirmative defense in the trial court, but incorrectly asserts that "our duty to correctly construe and apply statutes does not extend to making the parties' arguments for them, even if the arguments are statutorily based." 215 Or App at 247. This court has a duty to correctly interpret the meaning and the application of statutes that govern the issue, whether or not a particular statute is relied on by the parties. *Stull v. Hoke*, 326 Or 72, 948 P2d 722 (1997); *see also Miller v. Water Wonderland Improvement District*, 326 Or 306, 309 n 3, 951 P2d 720 (1998) ("[T]he parties may not prevent a court from noticing and invoking an applicable statute by relying only on other sources of law."). Finally, for purposes of preservation, courts continue to recognize the distinctions between raising an issue at trial, identifying a source for a claimed position and making a particular argument. "The first ordinarily is essential, the second less so, the third least." *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988). Here, the proposition that a search warrant affidavit need not negate a statutorily provided affirmative defense constitutes an argument as to why explicit references to amounts of usable marijuana in search warrant affidavits are not required.

marijuana may mitigate the symptoms or effect of that debilitating medical condition;

"(b) Is engaged in the medical use of marijuana; and

"(c) Possesses or produces marijuana only in amounts allowed in 475.306(1), or in excess of those amounts if the person proves by a preponderance of the evidence that the greater amount is medically necessary as determined by the person's attending physician to mitigate the symptoms or effects of the person's debilitating medical condition."

ORS 475.306(1)(b) provides that a "registry identification cardholder and that person's designated primary caregiver" may not collectively possess, deliver or produce more than "three mature marijuana plants, four immature marijuana plants and one ounce of usable marijuana per each mature plant." The words "usable marijuana" are defined to mean "the dried leaves and flowers of the plant Cannabis family Moraceae, and any mixture of preparation thereof, that are appropriate for medical use as allowed in ORS 475.300 to 475.346. 'Usable marijuana' does not include the seeds, stalks and roots of the plant." ORS 475.302(10).

The averments necessary to establish probable cause must be analyzed in light of the fact that possession of marijuana is illegal in Oregon and that possession of marijuana for medical purposes is an affirmative defense to a charge under *former* ORS 475.992. With regard to affirmative defenses, ORS 161.055(2) provides:

"When a defense, declared to be an 'affirmative defense' by chapter 743, Oregon Laws 1971, is raised at trial, the defendant has the burden of proving the defense by a preponderance of the evidence."

The trial court's holding would, in effect, require the state to negate an affirmative defense in its affidavit in support of the issuance of a search warrant, even though the defendant would have the burden of proof on that issue if the matter were to go to trial. In light of the fact that the legislature has assigned the burden of proof to defendants to prove that their possession is in compliance with the OMMA, it is unlikely that the legislature intended for the state to have that burden in order to procure a search warrant.[10]

---

[10] The OMMA is a statutorily created exception to what would otherwise be criminal conduct under Oregon's controlled substances laws. In that light, the

The trial court's focus on "usable" marijuana runs afoul of the statutory scheme in yet another way. The overarching criminal statutes, including *former* ORS 475.992(4)(f), make possession of more than one ounce of dried leaves, stems and flowers of the plant Cannabis family Moraceae criminal. As a subset of those statutes, the OMMA permits a defendant, if charged with the crime involving marijuana, to assert an affirmative defense under ORS 475.319. As part of that defense, a defendant must prove that the marijuana in his or her possession is "usable" marijuana as defined by ORS 475.302(10). *See* ORS 475.306(1). That is, a defendant's failure to prove that the marijuana in his or her possession satisfies the specific definition of ORS 475.302(10), or any of the other requirements of ORS 475.302(10), means that the defense under the OMMA *is not available to the possessor*. For example, if a medical marijuana cardholder possessed two ounces of seeds, stalks, or roots of the plant, the defense is not available, even though the cardholder possesses less than the three ounces of "usable" marijuana permitted by ORS 475.306(1). Alternatively, if a medical marijuana cardholder possessed four ounces of marijuana, "usable" or not, the defense would be unavailable. Thus, an affidavit from which it can be reasonably inferred that, more likely than not, a medical marijuana cardholder possesses more than the allowable quantity of "marijuana" states probable cause that *former* ORS 475.992 has been violated, regardless of whether the affidavit contains an averment about *usable* marijuana.

As indicated above, it is not clear whether the trial court made its finding regarding Loewen's credibility under ORS 133.693, but, in the final analysis, it makes no difference to the result that should occur in this case. If the trial court made its finding as part of its exercise of its authority under ORS 133.693, then the finding is not supported by any evidence adduced at the hearing on the motion to controvert. If it purported to make its finding as part of its probable cause analysis, then it was without authority to make a credibility finding because its review was confined to an objective

issue of what a search warrant affidavit must demonstrate for the search of the person or premises of a medical marijuana cardholder is a question of legislative intent.

evaluation of the remaining portions of the affidavit as excised. The majority is correct in the abstract that, if a defendant succeeds in showing that an affidavit contains averments that were not made in good faith, or that in its original state, it contained material inaccuracies or untruthful statements, then there is no occasion for deference to the issuing judge's decision, because that decision is the product of faulty information. *Harp*, 299 Or at 10; *see also State v. Culley*, 198 Or App 366, 373, 108 P3d 1179 (2005) ("When, as here, an affidavit has been successfully controverted, the suppression court resolves the sufficiency of the affidavit to establish probable cause for the warrant independently of the decision of the magistrate who issued the warrant."). But that principle simply does not assist the majority's position because the excised affidavit provides probable cause based on the facts that appear on its face, facts that make it more likely than not that controlled substances would be found in defendants' residence.

To recap regarding the issue of whether the remaining portions of the excised affidavit provide probable cause for the issuance of a search warrant, Loewen, a named informant, had personal experience with controlled substances, drug dealing, and the amount of marijuana permitted under the OMMA, and she was present in the residence when the police arrived. It is also inferable from her presence and her statements that she had firsthand knowledge of the drug activities at defendants' residence, including the fact that defendants were storing two pounds of marijuana in their closet in two plastic bags. Given her knowledge of drug dealing (as someone who "had once been a drug dealer" and who knew "the signs that go along with drug dealing"), her familiarity with the amounts permitted under the OMMA, and her observations regarding the activities at defendants' house, Loewen's statements that defendants were "way over their lawful allowable amounts" and that there "was a lot more than medical marijuana going on" at defendants' residence, would lead a reasonable person to believe that evidence of illegal drug activity probably would be found at the house.[11]

_____

[11] The state also argues that, even without Loewen's statements, the affidavit in support of the issuance of the search warrant—as excised—states facts that make it more likely than not that more marijuana would be found at defendants'

Unfortunately, the majority's analysis has become side-tracked because it fails to analyze the issues that must necessarily be decided in order to determine whether probable cause exists based on the excised affidavit. The fact that defendants possessed medical marijuana cards under the OMMA was only one of several facts before the issuing judge. The trial court improperly afforded supremacy to that fact and held that it trumped all other facts in the affidavit that otherwise made it more likely than not that defendants possessed illegal amounts of marijuana. But, under general rules of construction regarding search warrant affidavits and the statutory scheme of the OMMA, the mere fact that there may be an alternative, innocent explanation for the circumstances described in the affidavit does not mean that a reasonable person could not conclude that defendants were in possession of illegal amounts of marijuana, if the overall pattern of activity reasonably leads to that conclusion. *See, e.g.*, *State v. Christen/Hankins*, 79 Or App 774, 720 P2d 1303 (1986) (holding that high electric bills by themselves did not establish probable cause that a marijuana grow existed, but when combined with other facts, demonstrated probable

---

residence than permitted under their medical marijuana cards. After speaking with Loewen, the officers entered defendants' residence and made several observations from that vantage point. The trial court excised those observations from the affidavit and the derivative evidence from the observations on the basis that they were the product of a warrantless and unlawful search. The state does not challenge that ruling on appeal. The trial court also excised from the affidavit information that was acquired by the affiant from an unidentified informant. What remains in the affidavit after it was excised by the trial court is the evidence that the officers observed outside the house when they arrived to investigate the shooting of Michael Castilleja. Before entering the house, they saw six mature marijuana plants growing in defendants' greenhouse. When they returned to the property later in the day to interview Amber Castilleja, they observed that the plants growing in the greenhouse had been harvested and were in three clothes baskets inside the house. One detective stated that, "when he was sitting on the couch next to the harvested marijuana[,] it was taller than he was." Detective Rosario reported that "some of the marijuana buds were a foot or more in length" and that "clothes baskets appeared to contain the stems with the marijuana bud on them." He estimated that there were "approximately three pounds o[f] marijuana in the baskets." According to Rosario, the "smell of marijuana was so overwhelming that it gave them cotton mouth and made them feel strange." Detective Stone stated that, based on his training and experience, he knows that the average mature marijuana plant will produce approximately one pound of marijuana. A medical marijuana cardholder was allowed, under ORS 475.306(1) (2001), to possess three mature marijuana plants and four immature marijuana plants and up to one ounce of usable marijuana per mature plant excluding stalks at the grow site. ("Usable marijuana" does not include the seeds, stalks and roots of the plant.) In other words, the officers' observations of three pounds of harvested marijuana—even without Loewen's statements—supports the issuance of the search warrant.

cause to believe that illegal activity was occurring on the premises to be searched). Here, the officers' observations, as detailed in footnote 12 of this dissenting opinion, and the information given to them by the informant Loewen, whether considered separately or together, establish that it was more likely than not that defendants possessed greater quantities of marijuana than permitted by the OMMA.

I dissent for the reasons expressed above.[12]

Brewer, C. J., joins in this dissent.

**SCHUMAN, J.,** dissenting.

A warrantless search, even when it is lawful because it falls within one of the exceptions to the warrant requirement in Article I, section 9, of the Oregon Constitution, is the unilateral act of one branch of government, the executive, unchecked by judicial oversight. As such, the search runs counter to a fundamental principle—perhaps *the* fundamental principle—of American constitutionalism: distrust of unchecked executive power. For that reason, we should do everything within the law to encourage law enforcement officers and other members of the executive branch to avail themselves of the warrant process. One thing we can do is to take very seriously the mandate that, "[i]n testing an affidavit, a court is to construe it 'in a commonsense, nontechnical and realistic fashion * * *.' *State v. Charlesworth / Parks*, 151 Or App 100, 116, 951 P2d 153 (1997), *rev den*[,] 327 Or 82 (1998) (quoting *State v. Evans*, 110 Or App 46, 51, 822 P2d 1198 (1991))." *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001).

Under that standard, I conclude that the unchallenged and uncontroverted portions of the affidavit in this case, recited at 215 Or App at 272-73 n 11 (Edmonds, J., dissenting), justified the magistrate's decision to issue the warrant. The reviewing judge erred in ruling otherwise. In other

---

[12] Defendant Michael Santos Castilleja cross-assigns as error the trial court's refusal to excise other portions of the affidavit on the ground that Loewen's statements to police followed an illegal entry into the Castilleja residence. The conversation between Loewen and the police began before the police entered the residence and continued after the entry. Defendants have not demonstrated any nexus between the illegal entry and Loewen's statements, and I would reject the cross-assignment of error for that reason.

words, even if we were to decide that Loewen's statements were properly excised and that Judge Jones's legal analysis deserves deference, the necessary result would nonetheless be reversal.

Landau, J., joins in this dissent.